Houston & Texas Central Railway Company et al. v.
State of Texas.

No. 877. Decided May 27, 1902.

**1.—Railway—Land Grant—Sidings.**

The Act of January 30, 1854, granting lands in aid of the construction of railroads (continued in force by the Act of November 13, 1866) authorized the issuance of land certificates for each mile of side track constructed, as well as of main track. (Pp. 515-526.)

**2.—Same—Statutory Construction.**

The provisions of section 12 of the Act of January 30, 1854, limiting the grant thereunder to any company "for more than a single track road with necessary turn outs," is not to be construed as descriptive of the character of road required to be constructed and put in running order, side tracks being necessary and implied in such construction; but the word "with," in its primary sense of "in addition to," is to be applied to the track to be estimated in issuing certificates. Brown, J., dissenting. (Pp. 520, 521.)

**3.—Same—Construction by Executive Officers.**

The construction placed upon a statute by governors and other officers of the State, especially after a long lapse of time and after the claims of innocent third parties may have intervened, ought not to be overturned except in a. clear case. (Pp. 521, 522.)

**4.—Houston & Texas Central Railway Company Land Grant—Special Act of 1866.**

The passage of the Special Act of September 21, 1866, governing the rights of the Houston & Texas Central Railway Company in the matter of land grants in aid of its construction, did not exclude that company from the benefit of the law of November 13, 1866, passed by the same Legislature, in aid of the construction of railways generally. Brown, J., dissenting. (Pp. 522-525.)

**5.—Same.**

The Act of November 13, 1866, appears to recognize the rights of railway companies to receive land grants for sidings under the Act of 1854, which it continued in force, and the Special Act of September 21, 1866, should be construed to harmonize with it, if capable of bearing that meaning, and to entitle the Houston & Texas Central Railway to a like grant under its terms. Brown, J., dissenting. (Pp. 522, 524.)

**6.—Constitution of 1869—Land Grants to Railways.**

Article 5, section 6, of the Constitution of 1869, prohibiting land grants except to actual settlers, merely prohibited future grants, and did not repeal existing laws permitting railways to acquire land by construction of their roads, nor avoid titles to lands so acquired by them thereafter under such previous laws. (Pp. 526-528.)

**7.—Same—Cases Discussed.**

Bacon v. Russell, 57 Texas, 409; White v. Martin, 66 Texas, 340; Holmes v. Anderson, 59 Texas, 482; Galveston, etc., Railway v. State, 81 Texas, 572; explained, limited and reconciled with Railway v. Keuchler, 36 Texas, 382. (Pp. 528-531.)

**8.—Statutory Construction.**

See both majority and dissenting opinions in this case for a discussion and application of the following principles of statutory construction: that distinct acts of the same Legislature are to be construed together; that construction of statutes by executive officers and by subsequent legislatures should be regarded; political and economic conditions as bearing on the legislative policy governing its actions; reports of legislative committees as bearing on legislative policy; that repeals by implication are not favored; and other rules of construction and interpretation. (Pp. 515-539.)

Error to the Court of Civil Appeals for the Third District, in an appeal from the District Court of Travis County.

The State sued the Houston & Texas Central Railway Company and Olcott for the recovery of land. Plaintiff had judgment and defendants appealed. The case was reversed and remanded; and both appellants and appellee, complaining of various rulings therein, obtained writ of error on the ground that the State was a party.

*T. D. Cobbs* and *Baker, Botts, Baker & Lovett,* for plaintiffs in error, Olcott and the Railway Company.—The laws of Texas authorized the issuance of the certificates in question for the construction of sidings, and, upon acceptance by the railway companies, became contracts which, under the Federal Constitution, coud not be impaired by any subsequent repeal of such laws. Act of March 11, 1848, Spec. Laws, 2d Leg., pp. 370-373; Act of Feb. 14, 1852, Spec. Laws, 14th Leg., pp. 142-147; Act of Feb. 7, 1853, Spec. Laws, 4th Leg., Extra Sess., pp. 36, 37; Act of January 23, 1856, Spec. Laws, 6th Leg., pp. 28-30; Railway v. State of

Texas, 170 U. S., 243; Act of Sept. 1, 1856, Spec. Laws, Adjourned Sess., 6th Leg., pp. 259, 260; Act of Feb. 4, 1858, Spec. Laws, 7th Leg., pp. 94, 95; Act of Feb. 8, 1861, Spec. Laws, 8th Leg., Extra Sess.; Act of Sept. 1, 1866, Spec. Laws, 11th Leg., pp. 33, 34; Ordinances of Convention of 1869, p. 59; Act of Aug. 15, 1870, Spec. Laws, Extra Sess., 12th Leg., pp. 325-328; Railway v. Odum, 53 Texas, 343; Act of Jan. 30, 1854, Gen. Laws, 5th Leg., pp. 11-15; Acts of Jan. 11, 1862, Gen. Laws, 9th Leg., Reg. Sess., pp. 43, 44, 46, 47; Davis v. Gray, 16 Wall., 203; Quinlan v. Railway, 89 Texas, 356; The Protector, 12 Wall., 702; Grigsby v. Peak, 57 Texas, 142; Act of Nov. 13, 1866, Gen. Laws, 11th Leg., 212; Const. of 1869, art. 12, sec. 43.

The issuance of land certificates for the construction of siding was authorized by law. Railway v. State, 81 Texas, 572.

The rule, that when there is doubt as to the meaning and application of a statute, the long continued construction adopted and acted upon by the State's executive officers charged with its execution is binding upon the courts, has often been followed and acted upon by this court. Heirs of Holliman v. Peebles, 1 Texas, 673-699; Hancock v. McKinney, 7 Texas, 384, 340; Jenkins v. Chambers, 9 Texas, 167, 230; Styles v. Gray, 10 Texas, 503; Ruis v. Chambers, 15 Texas, 586, 590; Herndon v. Robertson, 15 Texas, 599; Johnston v. Smith, 21 Texas, 722; De Court v. Sproul, 66 Texas, 370; Railway v. State, 77 Texas, 388. See also United States v. Arredondo, 6 Pet., 691; United States v. Railway, 98 U. S., 334, 341; Railway v. Railway, 112 U. S., 414, 418; Maxwell Land Grant Case, 121 U. S., 325, 381; Coal Co. v. United States, 123 U. S., 307, 216; United States v. Budd, 144 U. S., 154, 161; United States v. Railway, 142 U. S., 615, 621; United States v. California, etc., Land Co., 148 U. S., 31, 43; United States v. Railway, 148 U. S., 562; United States v. Railway, 150 U. S., 1; Chandler v. Mining Co., 149 U. S., 79.

The Constitution of 1869 did not repeal the laws granting lands to railroad companies, but such laws continued in force until long after the lands in question were earned and the certificates therefor were issued and located. Quinlan v. Railway, 89 Texas, 371; Railway v. State, 90 Texas, 607; Railway Co. v. Keuchler, 36 Texas, 382; Railway v. Gross, 47 Texas, 428. [Bacon v. Russell, 57 Texas, 409; Holmes v. Anderson, 59 Texas, 481; White v. Martin, 66 Texas, 340; Cattle Co. v. Bacon, 79 Texas, 5; Railway v. State, 81 Texas, 494; Railway v. State, 89 Texas, 340, were discussed by counsel.]

The familiar rule of construction that repeals by implication are not favored, and that where earlier and later acts can by any reasonable construction stand together they must so stand, and that the later act does not repeal the earlier, unless their provisions are clearly inconsistent or repugnant, have often been applied by this court. Neil v. Keese, 5 Texas, 23; Hanrick v. Hanrick, 54 Texas, 108; Laughter v. Seela, 59 Texas, 183; Scoby v. Sweatt, 28 Texas, 713; Railway v. Ford, 53 Texas, 364. See also The Distilled Spirits, 11 Wall., 356-364; Henderson's Tobacco, 11 Wall., 652, 658; Daviess v. Fairbairn, 3 How., 636-644;

United States v. Walker, 22 How., 299; McCool v. Smith, 1 Black, 459, 470. A provision forbidding the Legislature from, in the future, making such grants is certainly not inconsistent with previous legislation making such grants, which had been accepted by the grantees, and upon the faith of which important public works had been undertaken and largely completed.

Privileges granted by a special act or charter are not affected by general legislation on the same subject, but the special act and the general act may stand together—the one as the law of the particular case and the other as the general law of the land. Laredo v. Martin, 52 Texas, 561; Ellis v. Batts, 26 Texas, 707; Scoby v. Sweatt, 28 Texas, 728; State v. Stoll, 17 Wall., 425, 436; Ex Parte Crow Dog, 109 U. S., 570; New Jersey v. Yard, 95 U. S., 104, 117. It was evidently the intention of the framers of the Constitution to leave undisturbed the laws then in force granting lands to railroad companies for the time limited by their provisions.

The legislative acts granting lands to railway companies in consideration of the construction of their lines of railway when accepted by such companies became contracts within the protection of the Federal Constitution; and if the Constitution of 1869 was intended to repeal such laws the same was in contravention of the Federal Constitution prohibiting the State from passing any law impairing the obligation of contracts and from taking property without due process of law; and was therefore void.

Argument is unnecessary to show that legislative acts granting lands to railway companies in consideration of the construction of their railways, when accepted by such companies, are contracts within the protection of the Federal Constitution. The question is not open (Railway v. Railway, 70 Texas, 649, 657; Railway v. Brownsville, 45 Texas, 88, 96; Railway v. Texas, 170 U. S., 243; Davis v. Gray, 16 Wall., 203, 232), and the protection is as effectual against the impairment of a contract by a State Constitution as by a statute or any other act of the State. Railway v. McClure, 10 Wall., 511; White v. Hart, 13 Wall., 652; Delmas v. Insurance Co., 14 Wall., 661; Davis v. Gray, 16 Wall., 203; Gas Co. v. Light Co., 115 U. S., 650; Bier v. McGehee, 148 U. S., 140; Railway v. State, 170 U. S., 243.

*C. A. Culberson,* Attorney-General, for the State. [From brief in Court of Civil Appeals.]—It seems too clear for extended argument that under the terms of the Act of 1854 lands were not donated for sidings and turnouts. By section 6 of the act it is provided that any company having "completed and put in running order a section of 25 miles or more of its road" shall be entitled to the grant of 16 sections to the mile. Sidings and turnouts are necessary parts of railways, and they can not be completed or put in running order without them. Railway v. State, 81 Texas, 572; Railway v. Wilson, 17 Ill., 123; 1 Woods' Railway Law, pp. 479, 648, 653, 654; Low v. Railway, 18 Ill., 324; 1 Mora. on Corp.,

sec. 369; Railway v. Williams, 54 Pa. St., 107; Railway v. Speer, 56 Pa. St., 335; Black v. Railway, 58 Pa. St., 252; Pfaff v. Railway, 108 Ind., 148; Gas Co. v. City, 146 U. S., 258; Railway v. State, 77 Texas, 388; Suth. Stat. Const., sec. 307; United States v. Tanner, 147 U. S., 663.

If it be conceded that a proper construction of the Act of 1854 would allow land for sidings, the certificates and patents in this case were nevertheless wrongfully issued, because they were issued for a road which was built after the law ceased to be operative.

The judgment is presumed to be correct, and before it can be regularly or lawfully reversed, appellants should show affirmatively that the sidings were constructed, for which certificates in suit were issued, when the Act of 1854 was operative. Having failed to bring themselves within the exception, the judgment should be affirmed. Blum v. Looney, 69 Texas, 1.

This land grant under the Act of September 21, 1866, was conditioned upon the completion of its road in sections at stated times, which the company failed to do, and the grant under the act of November 13, 1866, is expressly made subject to the "same restrictions and limitations heretofore provided by law." Nor can the fourth section of the pretended special Act of August 15, 1870, have the effect to continue, or renew, or revive, the grant contained in the Act of September 21, 1866, and forfeited by noncompliance with its terms, for it was passed in undisguised violation of the Constitution. Railway v. State, 81 Texas, 597; Veto Message of Gov. Davis.

The special law of September 21, 1866, superseded the Act of January 30, 1854, and all other laws as to this company, and thereafter its right to lands must rest solely upon that act. This plainly appears from the fact that the act is made specially applicable to his company by name, is complete in itself, and provides for an accounting as to lands received under the Act of 1854. State v. Travis County, 85 Texas, 435.

That the Act of January 30, 1854, was repealed by the Constitution of 1869 is not an open question. Railway v. State, 81 Texas, 597; Bacon v. Russell, 57 Texas, 409; Holmes v. Anderson, 59 Texas, 481; White v. Martin, 66 Texas, 340.

Notwithstanding the explicit determination of this question by the Supreme Court, it is earnestly contended by appellants that because of a supposed contract between the State and appellant company, the Act of 1854 was irrepealable. Without entering elaborately into a discussion of the question, it may be said that the Act of 1854, on general principles, is of a class of laws repealable at the pleasure of the State except as to existing rights. Salt Co. v. Saginaw, 13 Wall., 373; Cattle Co. v. Bacon, 79 Texas, 5.

But with reference to this company we are not left to judge of the right of the State to repeal this act by general principles alone. The right is expressly reserved.

The act of the Commissioner of the General Land Office in issuing certificates and patents without authority of law is not binding on the

State. The act is absolutely void and will not support the claim of pur-
chase for value and without notice. Sherwood v. Fleming, 25 Texas
Supp., 408; Bryan v. Crump, 55 Texas, 1; Decourt v. Sproul, 66 Texas,.
368; Day, etc., Co. v. State, 68 Texas, 541, 557; Stoddard v. Chambers,.
2 How., 318; Sherman v. Buick, 93 U. S., 209; Moffat v. United States,.
112 U. S., 24.

The certificates were issued December 22, 1873, they were located and
the land surveyed January 31, 1874, and no part of the land was alien-
ated until September 8, 1888, more than fourteen years after the loca-
tion and survey. The land was acquired by the location and survey.
Sherwood v. Fleming, 25 Texas Supp., 408; Duren v. Railway, 24 S. W.
Rep., 258; Olcott v. Ferris, 24 S. W. Rep., 848.

*M. M. Crane*, Attorney-General, for the State.—This court in the case
of the Galveston, Harrisburg & San Antonio Railway Company v. The
State, 81 Texas, held that the Act of 1876 gave no land for sidings,
switches, or turnouts. That the decision is authoritative no one doubts.
I insist that the reasoning of the court in that case applies with equal
force to the Act of 1852, because both acts are substantially the same
except in the number of sections granted. Therefore, it seems to me
that there is no escape from the proposition that under the Act of 1852
appellant company was entitled to no land for sidings, switches, or turn-
outs, but only eight sections per mile for the main line.

I repeat that there is no substantial difference between the Act of 1852
and the Act of 1876, except that one gave eight sections and the other
sixteen sections to the lineal mile; but neither gave any lands for sid-
ings or switches. If I am correct in that, then it must follow that by
the Act of 1854 but eight additional sections were granted to the appel-
lant company in this case. The first section of the Act of 1854, above
quoted, limits the amount of land to sixteen sections of land per mile,
and therefore it reads substantially as the Act of 1876, and must, like
it, mean sixteen sections per mile of the main line. The entire decision
of the Court of Civil Appeals and the contention of appellant's counsel
is based upon the first part of section 12 of the Act of 1854, which says
that "no more than sixteen sections of land per mile shall be granted,.
nor to any company for more than a single track with necessary turn-
outs." The proviso in section 12 seems to have been lost sight of by
the court and counsel. It is as follows: "Provided, that this act shall
not be so construed as to give any company now entitled by law to re-
ceive eight sections of land, more than eight additional sections." If I
am right in this contention, then it must follow, as night follows day,
that eight additional sections is all that this road can get, and those
eight additional sections must be upon the basis of the Act of 1852,
and must mean sixteen sections of land for each lineal mile and none
for the sidings, switches, and turnouts. The act is incapable of any
other construction. Railway v. State, 81 Texas, 599-601.

The Act of 1852 gave nothing for sidings. If it be held that the

Act of 1854 does give land for sidings and switches, the railroad would receive more than eight additional sections per lineal mile under it than under existing law. The excess over eight additional sections that it would receive by that construction represents the amount of land in this suit. In giving more than eight additional sections to the mile, the very letter of our statute is violated. The office of a proviso is ordinarily to limit the application of language that has preceded the proviso. Suth. on Stat. Const., sec. 222; Savings Bank v. United States, 10 Wall., 294; Minis v. United States, 15 Pet., 445; Bank v. Collector, 3 Wall., 495; Potter's Dwarris, 118; Boon v. Juliet, 2 Ill., 258; Sedg. Stat. Const., p. 49, note a.

I submit that the language of the paragraph upon which the decision is based does not justify the conclusion reached by the Court of Civil Appeals. The intention running through all of the acts from 1852 to 1876, inclusive, was to give land for the building of main tracks only, and none for sidings, switches, or turnouts. Copies of all of the acts mentioned have been printed herein for the convenience of the court, and it seems clear to me that the legislative intention plainly exemplified through all of them was to encourage the building of railroads in Texas, and to pay for completed sections of road only. That involved the idea that no roads could receive the land grants except when completed with the necessary turnouts and switches. Because no road could be deemed completed or in running order unless it has all "necessary turnouts." The word used in the statutes, "completed," "completed and ready for use," "completed and put in running order," "single track with necessary turnouts," all mean the same thing. It does not follow that the State is to pay for the necessary turnouts, but it is to pay for the lineal miles of railroad thus completed, because the turnouts must be appended to and form a part of a completed railroad. Railway v. State, 81 Texas, 573; Railway v. Wilson, 17 Ill., 123; Low v. Railway, 18 Ill., 324; Railway v. Williams, 54 Pa. St., 107; Railway v. Speer, 56 Pa. St., 335; Black v. Railway, 58 Pa. St., 252; Pfaff v. Railway, 108 Ind., 148.

To recapitulate, the State submits that the language of the Act of 1854, construed as a whole, can not have the effect of giving to a railroad company any land for sidings and switches.

1.  Because the appellant company was entitled to earn eight sections of land to the lineal mile, and the Act of 1854 plainly stated that it should not be construed so as to give it more than eight additional sections. This excludes the idea of giving any lands for sidings or turnouts.

2.  Because the language of the act itself clearly indicates that the words "completed railroad," "completed and in running order," "completed and ready for use," and "single tracks with necessary turnouts," all mean one and the same thing,—that is to say, mean a road ready for use by the public, with all of its necessary appendages.

3. Because, if the language itself raises any doubt as to what should be a proper construction, by the authority of this court in the case above cited the grant should be most strictly construed in favor of the public or the State, and against the appellant.

4. That it being clear that if the rule last stated had been followed by the executive officers, no such a conclusion as some of them seem to have reached could have been arrived at, that therefore the construction of the executive department of the government should be entirely disregarded.

It would seem that from the express language of the act giving the railroad company the name of the Houston & Texas Central Railway Company, its relation to the State was fixed upon the same basis as that of the old company. The right to repeal or modify the Act of 1854, if it chose so to do, was therefore secured to the State by contract.

It is well known that one of the modes to repeal a statute by a State is to change its Constitution so as to make the Constitution conflict with the existing statute. I recognize another elementary rule in this connection, that Constitutions are prospective in their operation. The same may be said of repealing statutes. A repealing statute can not affect the existing rights of any person, no matter how that repeal may be effected. If the Act of 1854 had been expressly repealed by an act of the Legislature, all of the lands that had been earned under that act until the date of the repeal would belong to the railroad company, and the State would be without power to prevent its acquiring them. But the railroad company would be without power to earn any lands under the Act of 1854, after it had been repealed by an act of the Legislature. Yet the act of the Legislature would be in all things prospective. The section of the Constitution of 1869 was likewise prospective. The State was acting not through the Legislature, but through her Constitutional Convention,—the most emphatic way in which the intention of the people may be expressed. It declared in clear and explicit language that no more land should be thereafter given to railroad companies. It repealed by implication every act of the Legislature that expressed a contrary intention.

But even in the absence of contract above shown with the railroad company to the effect that the State should retain the right to repeal the Act of 1854, I respectfully submit that it had that right independent of the statute. Railway v. State, 81 Texas, 597; Jumbo, etc., Co. v. Bacon, 79 Texas, 5; White v. Martin, 66 Texas, 340; Holmes v. Anderson, 59 Texas, 481; Bacon v. Russell, 57 Texas, 409; Salt Co. v. Saginaw, 13 Wall., 303.

*T. S. Smith,* Attorney-General, and *T. S. Reese,* Assistant, also filed printed argument, with citation of authorities, on behalf of the State.

*Hefley, McBride & Watson,* with consent of counsel, filed printed argument, as amici curiae, on the question of forfeiture.

GAINES, CHIEF JUSTICE.—This action was brought by the State of Texas to recover of the Houston & Texas Central Railway Company and F. P. Olcott 170,880 acres of land located and surveyed by virtue of certificates issued to the defendant company. Among the grounds upon which the recovery was sought were three: First, that at the time the sections of railroad were completed for which the certificates were issued, the law which authorized a grant of lands to railroads had ceased to be operative by its own limitation and had also been repealed by the Constitution of 1869; second, that the certificates, by virtue of which the lands in controversy were located, were issued for side tracks, and that the law did not authorize the issue of certificates for sidings; and third, that if the grants were valid, the title thereto had been forfeited by failure of the company to alienate them within the time prescribed by the statutes which authorized the grant.

The trial judge filed his conclusions of fact and held that the certificates were not authorized by law, but also expressly declined to pass upon the question of forfeiture. Judgment was rendered for the State for the recovery of the lands, and appeal was taken to the Court of Civil Appeals, errors being assigned to the trial judge's conclusions of law only. The Court of Civil Appeals held that the certificates were valid and reversed the judgment and remanded the cause for the trial of the questions of forfeiture. All questions of fact as to the time and manner of the construction of the railroad were settled by the findings of the trial judge and the approval of such findings by the Court of Civil Appeals. In passing upon these facts, the Court of Civil Appeals say: "The facts as ascertained by the lower court do not show failure in the construction of any part of the road, except such as is condoned by acts of the Legislature, relieving the company of a forfeiture of any part of its land grant by the State; and we conclude that there was no forfeiture on the grounds stated." The forfeiture here referred to is the forfeiture for failure to construct the several sections of the road within the time prescribed by the statute.

It is apparent from the conclusions of fact found by the trial court that the certificates upon which the surveys in controversy were made were issued wholly for the construction of side tracks, but at what time the sidings were constructed does not clearly appear. It does appear, however, that a portion at least were constructed after the Constitution of 1869 went into effect.

The logical order of the questions presented is: (1) Did the law in force at the time the work was done for which the certificates were issued authorize a grant of land to the Houston & Texas Central Railway Company for the construction of its road; (2) if so, did the authority include a grant for side tracks; and (3) if both these questions be answered in the affirmative, have the lands been forfeited by reason of a failure to alienate them within the time prescribed by law?

But since, if it be determined that the company was in no event entitled to certificates for sidings, it would be unnecessary to determine

the other questions, and since the discussion of that question involves, in a measure, a discussion of the first, it will be first considered. But before entering upon the construction of the statutes involved in the consideration of the point, it is useful to relate briefly a history of the legislation of the State which authorized a grant of land for the construction of railroads in general, as well as the legislation with reference to the defendant company in particular.

The Houston and Texas Central Railway Company was incorporated by act of the Legislature approved March 11, 1848, under the name of the Galveston & Red River Railway Company. It was among the first special charters granted by the Legislature of the State. Like all similar charters granted by that and the succeeding Legislature, it was crude in its provisions and meager in its details. But with the Legislature which met in 1851, a marked change in the legislative policy with reference to railroad companies was manifested. No general law upon the subject was enacted at that session. But an act was passed by that Legislature amending the charter of the Galveston & Red River Railway Company, and in the preamble thereto we find the following declaration: "And whereas it is desirable to preserve uniformity in the several acts establishing railway companies passed by this Legislature, the following provisions are hereby adopted," etc. Then follow certain general provisions relating to the rights and duties of the company with reference to the general public. These same provisions had been incorporated in the charter of one company which had been previously passed in precisely the same language and were incorporated in all subsequent charters granted at that session. Among them were provisions for the condemnation of lands for use of the respective companies, conferring the right to take lands by gift or purchase, requiring the respective companies to keep in repair all crossings of public roads, to draw the cars of other railroad companies, and fixing a maximum charge for the carriage of freight and passengers. This Legislature also inaugurated the policy of granting lands to encourage the construction of railroads; and, in accordance with its declared policy of uniformity of legislation with respect to railroad companies, in each of the charters authorizing the incorporation of such companies passed at its session, a grant of eight sections of the public lands for each mile of railroad to be constructed was authorized under certain conditions. The same provision as to the Galveston & Red River Railway Company is found in the amended charter of that company passed at this session. The respective grants were not only the same in substance, but they are couched in precisely the same language. The following are the terms in which the respective concessions are made: "There shall be granted to said company eight sections of land of six hundred and forty acres each, for every mile of railway actually completed by them and ready for use; and upon the application of the president of the company, or any duly authorized agent thereof, stating that any section of five miles or more of said railway has been completed and is ready for use, it shall be the duty of the Comp-

troller of Public Accounts to require the State Engineer, or a commis-
sioner to be appointed by the Governor, to examine said railway, and
upon his certificate that said section of said railway has been com-
pleted in a good and substantial manner, and is ready for use, the Comp-
troller shall give information of that fact to the Commissioner of the
General Land Office, whose duty it shall be to issue to said company land
certificates to the amount of eight sections of land, of six hundred and
forty acres each, for each and every mile of railway thus completed and
ready for use; such certificates shall be for six hundred and forty acres
each, and shall be located upon any unappropriated public domain of the
State of Texas, within twelve months from the issuing thereof, which
date shall appear upon the face of each certificate; and upon the return
of the field notes of any survey made by virtue of any certificate thus
issued, it shall be the duty of the Commissioner of the General Land
Office to issue patents to said company in their corporate name; one-
fourth of which said lands thus patented shall be alienated by the
company in six years, one-fourth in eight years, one-fourth in ten years,
and the other fourth in twelve years, so that the whole of the lands
thus granted shall pass from the hands of the company within twelve
years from the date of the patents thus issued."

In pursuance of the policy which had been previously pursued and
for the further encouragement of the construction of railroads, the next
succeeding Legislature passed a general law applicable to all railroads
then chartered which enlarged the concession to sixteen sections of land
to the mile and prescribed sundry conditions of the grant. So much of
that act as is pertinent to the question under consideration we set out:

"Sec. 1. Be it enacted by the Legislature of the State of Texas, that
any railroad company chartered by the Legislature of this State, hereto-
fore or hereafter, constructing within the limits of Texas a section of
twenty-five miles or more of railroad, shall be entitled to receive from
the State a grant of sixteen sections of land for every mile of road so
constructed and put in running order."

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Sec. 12. That the provisions of this act shall not extend to any
company receiving from the State a grant of more than sixteen sections
of land nor to any company for more than a single-track road, with the
necessary turnouts; and any company now entitled by law to receive a
grant of eight sections of land per mile for the construction of any rail-
road, accepting the provisions of this act, shall not be entitled to receive
any grant of land for any branch road; provided, this act shall not be
so construed as to give to any company now entitled by law to receive
eight sections of land, more than eight additional sections; provided,
that no person or company shall receive any donation or benefit under
the provisions of this act, unless they shall construct and complete at
least twenty-five miles of the road contemplated by their charter within
two years after the passage of this act; and such donations shall be
discontinued in every case where the company or companies shall not

construct and complete at least twenty-five miles of the road contemplated by their charter, each year after the construction of said first mentioned twenty-five miles of road; and further provided, that the proviso herein contained shall not extend to any railroad, the terminus of which is not fixed on the gulf coast, the bays thereof, or on Buffalo Bayou, and that nothing in this section shall be so construed as to extend the duration of any existing charter; and further provided, that the certificates for land issued under the provisions of this act shall not be located upon any land surveyed or titled previous to the passage of this act; and further provided, that this act shall continue in force for the term of ten years from the time it shall take effect and no longer."

Sections 2, 3, 4 and 5 contain provisions giving a right to a reservation of lands for locations by railroad companies, and such provisions were expressly withdrawn from the benefits conferred by the Act of November 13, 1866. The sections are therefore omitted. The other sections not copied throw no light upon the questions discussed in this opinion, save the sixth and seventh. They merely provide that the lands acquired from the State shall be alienated within a certain number of years, and in case of a failure to do so, for a sale by the Comptroller of Public Accounts.

By the special Act of January 23, 1856, the time for the construction of the Galveston & Red River Railway Company was extended. That act contains the following provisions: "But said company shall be entitled to the rights, benefits, and privileges granted by an act approved January thirtieth, eighteen hundred and fifty-four, entitled 'An act to encourage the construction of railroads in Texas by donations of lands,' upon the completion of said twenty-five miles within said six months, and the rights, benefits, and privileges of said act shall be confined to said company; provided, it shall construct and complete twenty-five miles of road each year after the expiration of said time; provided," etc. Thus it is seen that by this act the benefits of the general law, granting to railroad companies the right to acquire lands, were expressly conferred upon this company, and its provisions engrafted upon its charter: At the adjourned session of the same Legislature, the name of the corporation was changed from that of the Galveston & Red River Railway Company to that of the Houston & Texas Central Railway Company. 4 Gammel Laws, 806. The time for construction was again extended by each succeeding Legislature until the period of the war, and during that term a general act was passed continuing the benefits of the law of January 30, 1854, until two years after the close of the war.

In September, 1866, a special act was passed, which was approved by the Governor on the 21st day of that month, and which reads as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas, that the Houston and Texas Central Railway Company shall be entitled to receive from the State a grant of sixteen sections of land, of six hundred and forty acres each, for every mile of road it has con-

structed, or may construct, and put in running order, 'in accordance with the provisions of the charter of said railroad company;' provided, that the lands heretofore drawn by said company, by virtue of an act to encourage the construction of railroads in Texas, by donation of lands 'approved January 30, 1864' [1854] be deducted from the amount of lands granted hereby; and provided further, that the land certificates heretofore issued to this company on the three first sections of their road, by virtue of the act aforesaid, be included in the terms, benefits, and conditions of this act, as if issued by virtue of its provisions, and further provided, that said company shall construct and put in running order a section of twenty-five miles of additional road to that now built, within one year from January 1, 1867, or fifty miles within two years from that date; and such grant of land shall be discontinued when said company shall fail to construct and complete at least twenty-five miles of road contemplated by their charter each year after the construction of said first mentioned fifty miles of road; provided, that said road shall be put in running order to Bryant's Station, and cars run regularly thereon, by the first day of September, 1867.

"Sec. 2.   Whenever said company shall have completed and put in running order a section of twenty-five miles or more of its road, beyond the point which land has been granted and drawn, they may give notice of the same to the Governor, whose duty it shall be [to] appoint some skillful engineer to examine said section of road, and if, upon the report of said engineer, under oath, it shall appear that said road has been constructed in accordance with the provisions of its charter, and of the general laws of the State, in force at the time, regulating railroads, thereupon it shall be the duty of the Commissioner of the General Land Office to issue to said company certificates of six hundred and forty acres each, equal to sixteen sections per mile of road so completed, thereupon said company may apply to the district surveyor of any land district to survey any quantity of vacant land subject to location and entry in such district, not to exceed twice the quantity of certificates so issued, and may cause to be surveyed the land so designated into sections of six hundred and forty acres each, or half sections of three hundred and twenty acres each, which surveys shall be delineated upon a map or maps, the even and odd sections and half sections, and being differently colored and regularly numbered from one upwards, to the full number contained in the block, and the field notes of said survey and map or maps shall be by said company deposited with the Commissioner of the General Land Office, and it shall be the duty of said Land Commissioner to issue to said company patents for the odd sections and half sections of said surveys; and all the alternate or even sections and half sections shall be reserved to the use of the State until appropriated by law, and not liable to location, entrance or pre-emption privileges.

"Sec. 3.   That surveys under the provisions of this act shall be made by deputies and district surveyors of the districts in which the land is situated, and the field notes shall be recorded in such district, and re-

turned to the General Land Office, as other surveys; and said railroad company shall construct their road in the line heretofore prescribed by "An Act for the relief of the Houston & Texas Central Railway Company," approved February 8, 1861."

On the 13th day of November, 1866, the Governor approved a general act for the benefit of railroad companies which reads as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas, that the grant of sixteen sections of land to the mile to railroad companies, heretofore or hereafter constructing railroads in Texas, shall be extended, under the same restrictions and limitations heretofore provided by law, for ten years after the passage of this act.

"Sec. 2. That the time for the alienation of the lands acquired by railroad companies, heretofore, shall be extended to fourteen, for the alienation of one-half of such lands, and to twenty-one years for the alienation of the other half; and, in the event such alienation does not take place, the said lands shall be forfeited to the State; and companies hereafter acquiring lands shall alienate the same in fourteen and twenty-one years from the date of acquisition, under a like penalty of forfeiture.

"Sec. 3. That the benefits of this act shall not apply to any company hereafter that avails itself of the provisions of the second, third, fourth, and fifth sections of an act entitled, 'An Act to encourage the construction of railroads in Texas,' approved January 30, 1854, or of the act supplementary thereto, approved February 16, 1858.

"Sec. 4. That it is not intended by the preceding section to interfere with or impair the rights which have been heretofore acquired by companies under laws heretofore in force, but to preclude companies from hereafter taking advantage of the provisions of sections 2, 3, 4 and 5 of the Act of January 30, 1854, and the supplementary act thereto of 16th February, 1858; provided, that all tap roads over twenty-five miles long shall be entitled to the benefits of this act.

"Sec. 5. That this act shall be in force from its passage."

The two acts last quoted are those we are called upon to construe. In the case of Quinlan v. Houston & Texas Central Railway Company, 89 Texas, 356, it was held that the Act of November 13, 1866, was constitutional and had the effect to revive or continue in force the Act of January 30, 1854. Unless that law was repealed by the Constitution of 1869,—a question hereafter to be considered,—then it was in force when the sections of railroad were constructed for which the certificates, by virtue of which the lands in controversy were located, were issued.

The questions, then, are: Did the Act of January 30, 1854, authorize a grant of land for sidings, and, if so, are its provisions repugnant to those of the special Act of September 21, 1866?

In the first section of the Act of 1854, the grant is declared in these words: "Any railroad company chartered by the Legislature of this State, heretofore or hereafter, constructing within the limits of Texas a section of twenty-five miles or more of railroad shall be entitled to receive from the State a grant of sixteen sections of land for every mile

of road so constructed and put in running order." The first part of the twelfth section is evidently intended to define more accurately the limitations of the grant by construing the language used in the first section. We quote this language again: "The provisions of this act shall not extend to any company receiving from the State a grant of more than sixteen sections of land, nor to any company for more than a single-track road, with the necessary turnouts; and any company now entitled by law to receive a grant of eight sections of land per mile for the construction of any railroad, accepting the provisions of this act, shall not be entitled to receive any grant of land for any branch road; provided, this act shall not be so construed as to give to any company now entitled by law to receive eight sections of land, more than eight additional sections," etc. The purpose of the first provision we have been unable to ascertain. We have not found any provision of law under which any railroad company in the State could at this time have claimed more than sixteen sections per mile. But this is unimportant. The meaning, however, of the provision, "nor to any company for more than a single-track road with the necessary turnouts," is in part clear. That is, a company which should build a double track road was to be entitled to claim lands but for a single track. But the question, what is meant by the words "with the necessary turnouts," is not free from difficulty. See Railway v. State, 81 Texas, 572. Was it their purpose merely to describe the kind of road for which the lands should be granted? Did the Legislature conceive it probable that any company would construct a road without the necessary side tracks? It would seem not. Besides, by the first section, the lands were to be given only for a section of twenty-five miles of railroad "constructed and put in running order." Clearly a section of twenty-five miles of railroad is not in running order without side tracks. Therefore, it would seem that to construe the phrase as merely descriptive of the character of the railroad to be constructed would be to give it a meaning which adds nothing to what had been previously expressed. On the other hand, the word "with," in one of its primary senses, is a word of addition, meaning "in addition to," and in that sense, it is in common and frequent use by the best writers as well as by people in general. Construing the word in that sense, the phrase would mean that in estimating the mileage of the railroad track for which certificates were to be issued, the side tracks were to be included. In the construction of grants by the sovereign, the rule is to resolve a doubt in favor of the government when the question can not be satisfactorily determined otherwise. But for this rule there should be no difficulty in applying the latter construction to the language in question. And in view of the fact, as found by the trial judge, that this has been the construction acted upon by the Governors and other officers of the State, whose duty it was to execute the law, we are of opinion that such construction ought now to prevail. Especially after a long lapse of time and after the claims of innocent third parties may have intervened, it is only in a very clear case that the courts would be justified

in overriding the action of successive administrations in issuing certificates and granting patents to the public lands.

This brings us to the question of the construction of the special Act of September 21, 1866, and of its effect upon the general law of November 13th of that year. It has been held that the latter act did not apply to railroad companies thereafter chartered. Quinlan v. Railway, supra. But that by its literal terms it embraced all companies then chartered is not to be denied. But whether, by reason of the fact that the special act made provision for the Houston & Texas Central Railway Company, that company was intended to be excluded from its benefits, and whether, if so, the two acts are inconsistent in any important particular, are matters to be considered.

The Legislature which met in 1866 was the first which convened after the close of the war. During the whole time of that eventful conflict all the energies of the people of the State were directed to the maintenance of the Confederate government, and all railroad construction was suspended. The Legislatures which met during the war had, as we have seen, passed acts for the benefit of the railroad companies of the State, extending the time prescribed for the construction of the several sections of these roads so as to prevent a forfeiture of the charters and of their rights to acquire lands under the Act of January 30, 1854. But when the government of the Confederate States had been suppressed, the States which composed it were treated by the United States as having been in rebellion against its authority, and hence grave doubts existed as to the validity of the acts passed during the war by the Legislatures of the seceding States. When peace was restored, there was no railroad company in the State which had completed its line and none which, but for the relief granted during the period of the war, was not in default for failure to construct in accordance with its charter and the general law which provided for a grant of lands. Under these circumstances, it was but natural that they should be solicitous to remove all questions as to their rights in the premises, and, in order to accomplish this end, to have the Legislature not only confirm their concessions as to past and future acquisitions, but also to extend the time within which their respective roads should be constructed. Nor is it to be doubted that the people of the State were equally desirous of encouraging the completion of the lines which had been partially constructed as well as the construction of the new roads. Accordingly we find that at an early day of the session of the first Legislature which met after the close of the war, the bill was introduced which resulted in the passage of the special Act of September 21, 1866. We are aware of the rule that in construing a statute it is not permissible to consider the proceedings of the Legislature antecedent to its passage. But as illustrating the prevailing sentiment upon the matter of the encouragement of the construction of railroads, we quote the reasons given by the committee of the house who recommended the passage of the bill: "Among the many reasons which actuated your committee with such cordial unanimity, they are of the

opinion that this bill, in effect, only confers a vested right conferred upon the company by previous laws of the State, some of which were passed during the period of secession, the validity of which, perhaps, may be questioned in the States and countries where the company may deside to use its credit. This bill will, if it becames a law, relieve the company from all such embarrassments, and will greatly aid in effecting such negotiations as are necessary to facilitate the further extension of the road at this time." A few days after the passage of this law, another special act granting like relief to the Eastern Texas Railroad Company was enacted. So far as we have been enabled to discover, these were the only special laws of a like character passed at this session. But before the passage of either, a bill had been introduced which was intended to grant lands to all railroad companies then chartered or thereafter to be chartered by the Legislature. This bill finally passed the two houses, but was vetoed by the Governor upon the ground that it was too liberal and that it departed in important particulars from the policy of the general law of January 30, 1854. A special objection urged by the Governor in his veto message was that it made no provision requiring the alienation of the lands to be acquired. After the veto and very near the close of the session, another bill was introduced, extending, in the main, the privileges of the Act of 1854, but requiring the alienation of the lands within certain periods under the penalty of forfeiture. This bill passed both houses and was approved by the Governor and is the law of November 13, 1866, hereinbefore referred to and quoted. It is a sound rule that "Ordinarily, if there are a general statute and one local or special, on the same subject, in conflicting terms, neither abrogates the other, but both stand together; the former furnishing the rule for the particular locality or case, the latter for the unexcepted places and instances." Bishop on the Written Law, sec. 112b. But it is to be presumed that different acts passed at the same session of the Legislature are imbued by the same spirit and actuated by the same policy, and they should be construed each in the light of the other. It is readily seen that those who were desirous of encouraging the completion of a road already partially constructed may not have deemed it prudent to take the chances on the enactment of a law for the relief of all the companies, and have urged the passage of a special act granting special relief to the particular company. Therefore, it would seen that because a special act was passed for the benefit of the Houston & Texas Central Railway Company at the same session at which a general law was enacted conferring similar benefits upon all the then existing companies within the State, the former should not be viewed as conferring any special privilege upon such company or as restricting the rights conferred by the general law. On the contrary, for the reason that it is to be presumed that a continuity of policy prevailed throughout the same session of the Legislature, we should expect to find that substantially the same benefits were intended to be conferred and the same restrictions imposed in the special law as in the general.

We quote again the first part of the first section of the special Act of September 21, 1866; "That the Houston & Texas Central Railway Company shall be entitled to receive from the State a grant of sixteen sections of land, of six hundred and forty acres each, for every mile of road it has constructed, or may construct, and put in running order 'in accordance with the provisions of the charter of said railroad company.'" This language is capable of two constructions, depending upon the question whether the clause, "in accordance with the provisions of the charter of said railroad company," was intended to qualify the words, "receive a grant," or only the words, "constructed or to be constructed." If the former be the true construction, then the meaning is that the same amount of lands are to be granted as is provided in the charter, subject to the same conditions and limitations, except as is otherwise provided in subsequent provisions of the act. If the clause is to be construed as qualifying only the words, "constructed or to be constructed," then the act provides for an absolute grant of land of sixteen sections per mile, subject to the condition only that the road shall be constructed in the manner and the periods of time provided in its charter. Since by the amendment to the company's charter which became a law in 1856, as we have seen, the benefits of the general law of January 30, 1854, were specially conferred upon it, and since that act thereby became a part of the charter, the former construction would give to the special act a meaning in harmony with the general law of November 13, 1866, which extended the operation of the general law of 1854 with some qualifications. The latter statute, in effect, repeals, as to companies availing themselves of its benefits, the second, third, fourth, and fifth sections of the Act of 1854, which sections made provision for reservations of public lands to satisfy the concessions. The second section of the special act has the same effect, for it provides merely for the issue of certificates for the lands and for their location by an official surveyor in alternate sections upon any part of the unappropriated public domain. The general law of 1866, it is true, provided that the lands should be forfeited to the State upon failure to alienate them in certain definite periods after their acquisition. The Act of 1854 provided merely for an enforced alienation,—that the Comptroller should sell them,—in case they were not alienated within the times prescribed by the act. Both imposed upon the railroad companies the obligation of alienation, but there was a difference in the penalty for the failure to perform the duty. This suggests that after having passed the special act, when the Legislature came to consider the general act for the relief of all railroad companies then chartered, it was deemed best to provide a more efficient remedy in order to secure a sale of the lands by the companies. The general policy of the two acts, as we construe them, seems to us to be the same. The fact that the Governor approved the special act, when at the same session he vetoed a bill for a general law granting lands to railroad companies for the reason, among others, that it did not require an alienation by the companies of the lands, indicates that he construed the special act

as it was construed by the committee of the house, which recommended merely as confirming, under certain restrictions, the concessions provided for in its charter, and not at all events relieving the company of the obligation to alienate the lands as prescribed in the previous laws.

We will add upon this branch of the case, that it seems to us that the language of the early charters and the first section of the Act of January 30, 1854, are both capable of the construction that lands were to be granted for sidings. That of the former is, that "there shall be granted to said company eight sections of land of 640 acres each for every mile of railway actually constructed and ready for use." Since a mile of said track is a mile of railway, the language is certainly broad enough to include sidings. The language of the first section of the Act of 1854 is as follows: "That any railroad chartered by the Legislature of this State heretofore or hereafter constructing within the bounds of Texas a section of twenty-five miles or more of railroad, shall be entitled to receive from the State a grant of sixteen sections of land for every mile of road so constructed and put in running order." Those words suggest a reason for a more restricted construction. The grant is made dependent upon the construction of a section of twenty-five miles. It would seem that the section was to be a section of twenty-five miles in lineal extension; and that, therefore, but for the construction placed upon the language by section 12 of the same act, it might be held not to include side tracks. But section 12 shows that the Legislature deemed the language of section 1 as being capable of a construction which would grant lands, not only for a single track and sidings, but also for a double track. Therefore they limited it to a single track and sidings. It seems, therefore, that section 12 indicates, in some measure, that the contemporaneous construction of these early charters was that they authorized a grant of lands for sidings; and that when the Legislature used the words "for every mile of railway constructed," they meant every mile of side track and main track. We can see no good reason why, if the Houston & Texas Central Railway Company sought relief at the hands of the Legislature, so as to exonerate it from suspicion of a forfeiture of its rights, it would have asked a diminished grant; nor, on the other hand, do we see why the Legislature should have desired to refuse that company a concession for side tracks, when it granted, at the same session, such concession to every other company in the State. Our conclusion upon this matter is, that by the Act of September 21, 1866, the Legislature extended to companies, under a specific condition, the rights previously conceded to the Houston & Texas Central Railway Company; and that by the Act of November 13, 1866, they intended to grant substantially the same relief to all railroad companies then existing in the State. The language of the latter act is broad and embraces all railroad companies theretofore and thereafter constructing railroads in the State, and makes no exception of the Houston & Texas Central Railway Company. Section 3 does, however, except all companies that should thereafter avail themselves of the second, third, fourth, and fifth sections of

the Act of January 30, 1854. Therefore, we think that the Houston & Texas Central Railway Company could either have availed itself of the special act by an acceptance of its provisions, or could have earned the lands under the general law of November 13, 1866.

It follows from what we have said that in our opinion the Houston & Texas Central Railway Company were entitled to the certificates by virtue of which the lands in controversy were located, unless the laws which authorized their issue were repealed by the Constitution of 1869. This brings us to the question, whether the effect of that Constitution was to repeal all laws previously enacted which authorized a grant of lands for the construction of railroads. The contention that they were is mainly based upon section 6 of article 5 of that Constitution. It reads as follows: "The Legislature shall not hereafter grant lands to any person or persons, nor shall any certificates for land be sold at the Land Office, except to actual settlers upon the same and in lots not exceeding 160 acres." In reference to the construction of Constitutions, Judge Cooley says: "In interpreting clauses we must presume that words have been employed in their natural and ordinary meaning. As Marshall, Chief Justice, says: 'The framers of the Constitution, and the people who adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said." ' This is but saying that no forced or unnatural construction is to be put upon their language; and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." Cooley, Const. Lim., 71. This would seem to apply with especial force to a Constitution which was framed for submission to a vote of the people and which was only to take effect after a majority of the legal voters in the State had cast their votes in its favor. Clearly the section quoted prohibited the Legislatures thereafter to be convened from making a direct grant of land to any one or more individuals or corporations. It has also been ruled,—as we think, correctly,—that it also prohibited future Legislatures from granting certificates to any person for past or future services or from conceding a right to railroad companies to acquire lands by the construction of railroads. Bacon v. Russell, 57 Texas, 409; Railway v. Quinlan, 89 Texas, 356. But at the time the Constitution of 1869 was framed and at the time it was adopted by the popular vote, there were railroads in the State which were constructing their roads, with the right, under the laws then existing, to acquire, subject to certain restrictions, sixteen sections of land for every mile of railroad to be constructed. The question

then recurs,—was it the intention to repeal these laws? There is nothing in section 6 of article 10 which indicates such a purpose. To the ordinary mind it imports merely a prohibition upon future legislation. It makes no mention of existing laws; and we fail to see how an inhibition against future laws of a certain character is to be construed as having any effect upon past legislation. If there be any such rule of construction—and we know of none—all doubt of the meaning of the provision in question is removed by the insertion of the word "hereafter." What could have been its purpose but to give emphasis to the idea that it was intended to apply only to the action of future legislatures? According to the familiar rule that the mention of one thing excludes another, the emphatic declaration that "the Legislature shall not hereafter grant," etc., indicates that the laws then in existence which authorized grants of land were not to be affected. In our opinion, the section means the same as if it had declared in so many words that "Existing laws making grants of land are not hereby repealed, but the Legislature shall not hereafter grant," etc. For the obvious reason that when a legislative body desires to repeal a law it is easy to express that purpose, repeals by implication are not favored; and the later law, whether found in a Constitution or an act of a Legislature, does not repeal another which is consistent with it, in the absence of some language indicating such intention. There is no inconsistency between prohibiting the passage of new laws providing for the grant of lands and leaving existing laws of a like character still in force.

The construction which we give to the section in question is sustained by the fact that when the framers of the Constitution came to make provision with reference to usury laws, they spoke in no uncertain terms. Section 44 of article 12 reads as follows: "All usury laws are abolished in this State, and the Legislature is forbidden from making laws limiting the parties to contracts, in the amount of interest they may agree upon for loans of money or other property; provided, this section is not intended to change the provisions of law fixing rate of interest in contracts where the rate of interest is not specified."

The ordinances which were passed by the convention which framed this Constitution also tend to show that it was merely the purpose of the section to prohibit the Legislature from providing for future grants. That convention, during its session, passed sundry ordinances incorporating railroad companies and providing for land grants to encourage the construction of their roads. It also passed an ordinance for the relief of the Eastern Texas Railroad Company which expressly "renewed and revived" all the rights, privileges, and immunities conferred upon that company by its original charter and the acts amendatory thereof. By its original charter, the privileges of the Act of January 30, 1854, with reference to grants of land to railroad companies were expressly conferred upon that company. These ordinances not having been submitted to the popular vote, did not become laws (Quinlan v. Railway, 89 Texas, 356); but they were passed as laws and with the intention

that they would become such without being passed upon by a vote of the people. They show the policy of the convention as clearly as they would have shown it had they taken effect as laws. They indicate that it was not the policy of the convention to withdraw altogether from the railroad companies of the State the right to acquire lands by the construction of their lines. The theory seems to have been either that the privileges already conferred by existing laws, together with those conferred by ordinance of the convention itself, would be sufficient to secure the construction of such lines of road as would justify the grants; or that the State could afford to grant no more lands than would likely be acquired under existing laws and the ordinances of the convention. Either, as it seems to us, was a sufficient reason for the action of the convention in calling a halt and in prohibiting future Legislatures from making such grants. It does not seem to us reasonable to suppose that the convention intended to take away from existing companies then constructing important lines of railroad the privilege of acquiring lands by such construction, and at the same time grant with no stinted hand the same privileges to new companies proposing to construct lines of far less importance. We conclude, therefore, that it was not the purpose of the convention, in enacting section 6 of article 10 of the Constitution of 1869, to repeal existing laws which provided for the acquisition of lands by railroad companies, and that the people who voted for the adoption of that Constitution did not so construe the section.

We have thus far treated this as an original question; but in the case of Railroad v. Kuechler (36 Texas, 382) the point came before the court and it was decided in accordance with the opinion we have just expressed. But, on the other hand, it is urged by counsel for the State that this decision is in conflict with subsequent decisions of this court. We can not, however, yield assent to the contention, and will briefly notice the cases upon which counsel rely.

The first is Bacon v. Russell, 57 Texas, 409. In that case, title to 640 acres of land was claimed by Russell by virtue of a special act of the Legislature passed in 1873, which purported to grant him "a land certificate for 1280 acres for his services one year in the army of Texas during the years 1835 and 1836, and a further certificate of 640 acres for his participation in the campaign against Bexar in 1835." A certificate for 640 acres was issued under this act and was located upon the land in controversy in that suit. A patent issued to Russell by virtue of such location. He was plaintiff in the trial court and the question arose as to the validity of the grant. In order to maintain the constitutionality of the special act, it was urged in his behalf that the certificate was not intended as an original grant, but that the purpose merely was to secure a right existing under previous laws awarding lands to those who served in the army of the Republic, and that therefore the act was not prohibited by section 6 of article 12 of the Constitution of 1869. In passing upon the question the court held, first, that since it did not appear that the services for which this 640 acres were granted

to Russell were the same as those which entitled a soldier to 640 acres of lands under the previous laws, "the inception and sole basis for his right rests upon the Act of February 19, 1873," and that therefore it was void. But in the opinion the court say further, in effect, that even if the services had been the same, the plaintiff would have been in no better position; and proceed to show that if he had ever had any rights under the former laws, they had been lost. In concluding upon this point, the court say: "In the absence of the constitutional provision referred to, the Legislature might have removed the bar and have given further time and means to acquire the certificates, as had been so often done before; but the right having ceased, and the Constitution having declared that the grant should not be made, the Legislature was powerless to revive the right which had once existed, but had been lost by the failure of the party to apply for and receive the same from some of the officers of the government authorized from time to time to issue the certificates." Since it was distinctly held that if Russell had ever had any right under the former laws, that right had been lost, we fail to see how the question of a repeal of such law was involved in the case. If the court had intended to hold that the Constitution of 1869 repealed all existing laws providing for grants of lands to individuals and to railroad companies and thereby to overrule the decision in the Keuchler case, it seems to us they would have so declared. Such a ruling would have been decisive of the case before them and would have rendered unnecessary the somewhat lengthy discussion in the opinion as to the question whether the act was merely intended to confirm a right previously granted, or whether its purpose was to make simply an original grant. The gist of the opinion is that, in any aspect, the special act was an original grant and was therefore prohibited by the Constitution.

In White v. Martin, 66 Texas, 340, an act of the Legislature passed in 1873 directed the Commissioner of the General Land Office to issue to "Absalon P. Joyce 640 acres, headright, in lieu of No. 162, issued in Shelby County, without the conditional," and the question of the validity of this act arose in the case. In determining the point, the court say: "The special act of the Legislature directing a certificate to issue in lieu of it was but, in effect, a direction to issue a land certificate as a donation. Such legislation would be the first and most important step in making a legislative grant of land. This, under article 10, section 6, of the Constitution then in force, it has been held, the Legislature then had no power to make," citing Bacon v. Russell, supra, and Holmes v. Anderson, 59 Texas, 482.

In Holmes v. Anderson, supra, the appellant claimed under a certificate granted to one Holmes by a special act of the Legislature passed also in 1873. In reference to the act, the court say: "If, at the time of the adoption of the Constitution of 1870, there existed a valid unsatisfied certificate to Willett Holmes for a league and labor of land, and it had been lost, and it became necessary to have such evidence of

that fact as would authorize Willett Holmes or his assignees to appropriate so much land, or if, for any other reason, it became necessary to issue to Holmes a certificate to evidence a right which he had, through a valid unsatisfied land certificate existing at the time of the adoption of the Constitution of 1870, then the Legislature had the power to direct a certificate to issue to evidence such right, although a duplicate might have been obtained under the general law.

"If, however, there was no valid unsatisfied certificate in favor of Willett Holmes for a league and labor of land in existence potentially, although the evidence of it may have been lost or destroyed, at the time the Constitution of 1870 was adopted, then the Legislature had no power to grant to Willett Holmes a land certificate for a league and labor of land as a headright, although at some past time the facts may have existed which would have entitled him to a certificate for that quantity of land. Bacon & Bates v. Russell, 57 Texas, 415.

"After the adoption of the Constitution of 1870, so long as it continued in force, the Legislature had no power to authorize the original issue of such land certificates as issued to Willett Holmes by reason of any equity or right which he, at some former time, may have had." The judgment was accordingly reversed and the cause remanded in order to give appellant the opportunity of proving that a valid certificate for a league and labor of land had been issued to Holmes and that it had been lost.

The case of Railway v. State, 81 Texas, 572, is also relied on in behalf of the State. In that case, the railroad company claimed the lands in controversy by virtue of the general law of 1876 and for the construction of a line to San Antonio. The right to construct this line was not embraced in its original charter, but was conferred by a special act passed in 1870. The general law of 1876 expressly denied its benefits to such companies as had failed "to comply with the terms of their charters with reference to a completion of portions of their roads in stated times." In endeavoring to show that the case did not fall within this restriction, the court use this language: "The Buffalo Bayou, Brazos & Colorado Railway Company had by special acts and by the general law of 1854 the right to receive lands for each section of twenty-five miles of railway constructed, but by a special act of February 4, 1854, it was restricted to an extension of its road to Austin, and to a line extending thence to a connection with any road running north of Austin to the Pacific Ocean. Spec. Laws 1854, pp. 69, 70. The privilege of constructing a railway to San Antonio was conferred by the special Act of 1870, which recognized the present corporation as the successor of the Buffalo Bayou, Brazos & Colorado Railway Company, and authorized the change of name. At the date of that act, the power to grant lands in aid of the construction of railways had been taken from the Legislature by the Constitution of 1870, and all laws making such grants impliedly repealed except as to existing rights. It follows that until the Act of 1876 went into effect, the appellant had never had any right to acquire

lands from the State by the construction of its line to San Antonio, and consequently there was no right in that respect which but for the proviso in question would have been renewed." The point decided was that after the Constitution of 1869 went into effect the Legislature could not, by authorizing a railroad company to change its line, confer upon it a right to acquire lands by the construction of such new line. The theory was that this was not the confirmation of a right to acquire land under a law existing when the Constitution of 1869 took effect, but that it was an additional and a new concession, and was therefore prohibited by the section under consideration. The Act of November 13, 1866, conferred the right to earn land upon all companies then chartered or thereafter to be chartered. The effect of the ruling was to hold that the Legislature, after the adoption of the Constitution of 1869, could not charter a new road and thereby give it a right to acquire lands, nor could it give such right to a chartered company for the construction of a new line. This was all that was meant by the expression in the opinion upon which counsel seem to lay stress,—that "all laws making such grants were impliedly repealed except as to existing rights." Clearly the companies existing at the time of the adoption of that Constitution, which had complied with their charters and the Act of November 13, 1866, had the existing right to acquire lands by a further construction in compliance with these laws. What the Constitution repealed was so much of the Act of 1866 as gave the right to all companies to be chartered in the indefinite future; and the effect of the section in question was to limit the operation of that act to such companies as had been chartered at the time when the Constitution went into effect.

Upon the question of forfeiture the Court of Civil Appeals say in their opinion: "The record does not furnish the data from which a computation could be made ascertaining what amount of the land in controversy should be forfeited for failure to alienate. Were it not for want of this precision in the proof, we could here render judgment; but, in the present state of the record we can not do so." We concur in this conclusion, and since the determination of the question of the right of the State to forfeit the lands in controversy involves many difficult points, we do not feel called upon to enter upon a discussion of the matter. We suggest, however, that it may be well, upon another trial, to make it appear whether the Houston & Texas Central Railway Company accepted under the special Act of 1866. It may be that if it did so accept, the State's right would be confined to an enforced alienation. Since we are of opinion that it was entitled to the lands granted under either the special or the general law, the taking of the lands does not alone show an acceptance of the former act.

We conclude, upon the whole case, that the judgment of the Court of Civil Appeals, which reversed that of the District Court and remanded the cause, is correct and that it should be affirmed. It is accordingly so ordered.

*Affirmed.*

### DISSENTING OPINION.

BROWN, Associate Justice.—I am not able to concur in the conclusion reached by the majority of the court, and feel constrained to enter my dissent and to state the reasons which influence my judgment.

The clear statement, by the majority, of the history of railroad legislation in Texas presents sharply the issues of law involved in the decision of the case, and relieves me from making any statement, except to develop the points of difference which arise in the application, to the facts, of recognized principles of law.

I was strongly inclined to the opinion that section 6 of article 10 of the Constitution of 1869 repealed the act of the Legislature entitled "An act for the benefit of railroad companies," approved November 13,. 1866 (General Laws, page 212) ; but the forcible argument of the Chief Justice upon this branch of the case has satisfied me that it was not the intention of the convention which adopted that Constitution to repeal existing laws, but to prohibit the enactment of such laws in the future.

I concur with the majority in the construction placed upon the Act of January 30, 1854. Pasch. Dig. of Laws, art. 4945, et seq. But my concurrence rests alone upon the ground that the statute was so construed by the officers charged with its enforcement. It is my opinion that the Legislature did not intend to grant lands for the sidings or switches, but for the length of the line, and that the phrase "with the necessary turnouts" was descriptive of the single track road, rather than expressing the length of line for which the grant was to be made; but the language furnishes some ground for the interpretation, and the Legislature of 1866 extended the time for which the act should be in force, without modifying its terms, which had the same effect as if it had been re-enacted, and places upon the court the injunction to construe the re-enactment in conformity with the construction which had been placed upon the original act.

I understand the opinion of the majority to rest upon two propositions : First, that the Houston & Texas Central Railway Company had the right to take the benefit of both the general and the special laws of 1866, or either of them, and that it is the duty of the court to sustain the grant made, if within the provisions of either act. Second, that the language of the special act of 1866, for the benefit of the Houston & Texas Central Railroad, should be made to harmonize with the language of the general act, and that its terms should be construed to embrace the rights, benefits and privileges granted railroads under the Act of January 30, 1854.

From these propositions I respectfully dissent, admitting that if either be sound, the judgment of the majority is correct.

The opinion of the majority does not clearly assert, but strongly implies, that the railroad company had the right to reject the special act and take the benefit of the general law. It is undoubtedly true that

the State can not force citizens into a private corporation; therefore it is held that there must be some evidence of the acceptance of a charter for a private corporation by the persons named as incorporators. Cook on Corp., sec. 2a. But I have not been able to find any authority holding that it is necessary to show acceptance by a corporation of a special act passed for its benefit or for its government. The Legislature had the right to confer the State's bounty upon the different corporations upon such terms and in such quantities as that department might determine, and the acceptance of the land involved the acceptance of the terms of the grant. The railroad company might have declined to receive the lands, but that will not support the conclusion that it could claim the benefits of the general law from which it was excepted. It is a matter of common knowledge that this class of legislation has been, and is, sought by the corporations,—the bills are prepared by their counsel and passed under their supervision. Such laws express in a greater degree the intention and desire of the corporate body than of the legislative department of the government. Railway v. Reed, 64 N. C., 158.

The general law of November 13, 1866, and the special Act of September 21, 1866, were passed at the same session of the Legislature, and since they make different provisions for corporations of the same class, they are, to that extent, in conflict, and it is the duty of the court to construe them so that both may have effect,—the general law applying to railroads generally and the special law to the Houston & Texas Central Railway Company. The two should be considered as if embodied in one act, the special law being treated as an exception to the general rule expressed in the general law. Crane v. Reeder, 22 Mich., 334; State v. Perrysburg, 14 Ohio St., 472; State v. Treasurer, 41 Mo., 24; Waldo v. Bell, 13 La. Ann., 329; Wood v. Commissioners, 58 Cal., 561; Stockett v. Bird, 18 Md., 489; Brown v. Commissioners, 21 Pa. St., 37; Black Int. Laws, 117; Suth. Stat. Const., sec. 217.

In Crane v. Reeder, above cited, that eminent jurist, Judge Christiancy, said: "Where there are two acts or provisions, one of which is special and particular and certainly includes the matter in question, and the other general, which, standing alone, would include the same matter, and does not conflict with the special act and provisions, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are contemporaneous, as a Legislature is not presumed to have intended a conflict." This rule of construction is well sustained by the authorities. Judge Christiancy said: "The authorities would warrant the stating of the rule of construction in much broader terms than I have given it."

The office of an exception is to exclude from the general terms of the law the subject mentioned in the exception. Suth. Stat. Const., 217.

Considered as an exception, the special law of September 21, 1866, excluded the Houston & Texas Central Railway Company from the provisions made for railroad companies by the general law of November 13,

1866, just as if it had been written "that the grant of sixteen sections of land to the mile of railroad, except the Houston & Texas Central," etc.; and being excluded, the corporation would not, by its repudiation of the special act, be embraced in the general law, contrary to the intention of the Legislature.

When the special law was before the House of Representatives, the committee on internal improvements made the following report: "Among the many reasons which actuated your committee with such cordial unanimity, they are of the opinion that this bill in effect only confers a vested right conferred upon the company by previous laws of the State, some of which were passed during the period of secession, the validity of which, perhaps, may be questioned in the States and countries where the company may desire to use its credit. This bill will, if it becomes a law, relieve the company from all such embarrassments, and will greatly aid in effecting such negotiations as are necessary to facilitate the further extension of the road at this time." At a subsequent day, when the bill was before the house, a substitute was offered, entitled "An act granting lands to railroad companies." The house rejected the substitute, showing a determination to deal with this company separately from all others. These facts and circumstances which accompanied the enactment of this law show that the Legislature and railroad company intended and desired that its interests should be separated from the general railroad law of the State, and should be embodied in one act, by which all of the trouble that might arise out of the failure of the corporation to perform conditions which had been prescribed, and the danger of having its rights challenged on account of their origin in some of the enactments during the period of secession, would be avoided. This purpose to cut loose from the general law of January 30, 1854, is made more manifest by the following language of the special act itself: "Provided, that the lands heretofore drawn by said company by virtue of an act to encourage the construction of railroads in Texas by donations of land (approved January 30, 1854), be deducted from the amount of lands granted hereby; and provided further, that the land certificates heretofore issued to this company, on the first three sections of their road, by virtue of the act aforesaid, be included in the terms, benefits, and conditions of this act, as if issued by virtue of its provisions."

Construing the language of the two acts together as one, it seems to me plain that if the Legislature had intended to include the Houston & Texas Central in the general terms it would not have adopted the proviso which takes out of the operation of the general law all of the lands granted and to be granted to that railroad company.

Regarding the special Act of 1866 as the only source of authority for issuing the certificates under which the land in question was located, I come to the construction of that act, the granting clause of which is in the following words: "The Houston & Texas Central Railway Company is entitled to receive from the State a grant of sixteen sections of land,

of six hundred and forty acres each, for every mile of road it has constructed, or may construct and put in running order, in accordance with the provisions of the charter of said railroad company." In the case of Railway v. State, 81 Texas, 599, the court had under consideration the Act of August 16, 1876, which was expressed in this language: "That any railroad company heretofore chartered, or which may be hereafter organized under the general laws of this State, shall, upon the completion of a section of ten miles or more of its road, be entitled to receive, and there is hereby granted to every such railroad from the State, sixteen sections of land for every mile of its road so completed and put in good running order." This language is practically the same as that of the special act under consideration. This court held that the grant, by the law of 1876, was for each mile in length of railroad, not including the side tracks, turnouts, etc., distinguishing that law from the law of January 30, 1854, by the absence of this language: "The provisions of this act shall not extend * * * to any company for more than a single track road with necessary turnouts." This language is not in the Act of September 21, 1866, which falls so clearly within the case of Railway v. State that I can not do better than quote from that opinion as follows: "Can it be contended that upon the completion of a section of ten miles a company would be entitled to receive lands for every mile of road completed by it on some other portion of its lines? And if not, upon what theory can side tracks be construed to be within the purview of the statute when they are not mentioned by the distinctive appellation by which they are commonly known? It is true that side tracks are necessary appurtenances to every railroad constructed for public use, but the deduction from this is not that the Legislature intended to grant lands for their construction, in the absence of words in the statute evidencing that intent." The terms of the act in question are not broader than those of the law construed in that case, and to my mind, there is no material difference in their terms. But the majority of the court read into the special act the qualifying words embraced in section 12 of the Act of 1854, thereby reconstructing the special Act of 1866, so as to make it practically read thus: "for every mile of single track road with necessary turnouts," etc.,—bringing the special act within the construction given by the officers in executing the law of 1854. To reach this interpretation, the majority construe the language, "in accordance with the provisions of the charter of said railroad company," as qualifying the granting clause thus: "shall be entitled to receive from the State a grant of sixteen sections of land, of six hundred and forty acres each, in accordance with the provisions of the charter of the said railroad company, for every mile of road it has constructed, or may construct and put in running order." To sustain this construction, resort is had to a special act of the Legislature, "supplementary to the several acts incorporating the said company, approved January 23, 1856," in which this language occurs: "But the company shall be entitled to the rights, benefits, and privileges granted

by an act approved January 30, 1854, entitled 'An act to encourage the construction of railroads in Texas by donations of lands.'" I can not concur in this transposition of the terms of this statute in order to reach the conclusion that by the special act the Legislature intended, through its charter, to confer upon that railroad company the benefits of the law of 1854. If the Legislature had desired to refer to that law for the quantity of land to be granted, it would have been so natural to do so in direct terms that one hesitates to believe that the indirect method was adopted. The circumlocution of going through an amendment of the charter to reach an expression of the terms of the former act is, in my judgment, unwarranted by anything to be found in the law itself, or in the circumstances accompanying its enactment. The natural construction of the statute is that the qualifying phrase applied to the last preceding subjects "has constructed, or may construct and put in running order." That construction would be natural and consistent; the language aptly applies to "construct" as a subject, but it must be strained to qualify the granting clause. Suth. Stat. Const., secs. 223-267. I think the relation of that phrase to the preceding phrases is determined definitely by the provisions of section 2, in which it is provided that upon the completion of twenty-five miles of the road the company may give notice to the Governor, who shall appoint a skillful engineer to examine the track, "and if upon the report of said engineer, under oath, it shall appear that said road has been constructed in accordance with the provisions of its charter and the general laws of the State in force at the time regulating railroads, thereupon it shall be the duty of the Commissioner of the General Land Office to issue to said company certificates of six hundred and forty acres each, equal to sixteen sections per mile of road so constructed." Certificates were to be issued for the land granted, and the amount of certificates was to be determined by the miles "constructed in accordance with the terms of its charter." It follows that the grant was for the like number of miles "so completed," and the qualifying clause is thus known to refer to the phrase which preceded it in the sentence.

I repeat that it appears to me from the circumstances and the language used in the special Act of September 21, 1866, that the Legislature intended, and the railroad company desired, that the Houston & Texas Central Railway Company should be definitely separated from the general railroad laws of the State, and that all of its rights should be represented by that special act. In the report of the committee before quoted it is stated, as one of the reasons why the law should pass, that if it should became a law the affairs of the company would be relieved of all embarrassment by reason of the fact that some of the laws upon which its rights depended had been enacted during the time of secession, and though not expressed, it can be read between the lines that many forfeitures and failures which occurred during that period would be condoned by the enactment of this special law, and the law applicable to the rights of that company would be so simplified as to

address itself favorably to the financiers of other States and countries. Disregarding the charter of that railroad and all former laws, the special law of 1866 granted to that company sixteen sections of land for every mile of road theretofore built or thereafter constructed. If all former grants were forfeited and all other laws which granted lands were repealed, that special act would support the title to all lands of that railroad company granted for construction of the road. It is complete within itself. It reaches back to the throwing of the first shovel of dirt at Houston, and forward to the driving of the last spike at Red River. It bridges every chasm and condones every forfeiture,—gathering under its protection all lands previously granted and all certificates theretofore issued. If the law of January 30, 1854, was to be the authority for future grants, why deduct lands before granted under that law, and why include certificates before issued under it in the provisions of the special law? The terms of the special act are consistent alone with the intentions foreshadowed by the committee report that this railroad company desired to have all of its land grants grouped under this one act, which would disembarrass it of the past and be so simple as to recommend it to capitalists in other States and countries.

My associates arrive at the conclusion that the original charter of this railroad company, as amended February 14, 1852, granted land for the sidings, as well as for the main track. The language of the charter is as follows: "There shall be granted to said company eight sections of land, of six hundred and forty acres each, for every mile of railway actually completed by them and ready for use, and upon the application of the president of the company, or any duly authorized agent thereof, stating that a section of five miles or more of said railway has been completed and is ready for use, it shall be the duty of the Comptroller of Public Accounts to require the State Engineer, or a commissioner to be appointed by the Governor, to examine said railway, and upon his certificate that said section of railway has been completed in a good and substantial manner, and is ready for use, the Comptroller shall give information to that effect to the Commissioner of the General Land Office, whose duty it shall be to issue to said company land certificates to the amount of eight sections of land, of six hundred and forty acres each, for every mile of railway thus completed and ready for use." The language of the Act of 1876, which was construed in Railway v. State, cited above, is as follows: "That any railroad company heretofore chartered, or which may be hereafter organized under the general laws of this State, shall, upon the completion of a section of ten miles or more of its road, be entitled to receive, and there is hereby granted every such railroad, from the State, sixteen sections of land for every mile of its road so completed and put in running order." There is no substantial difference between the provisions of the two laws; each grants to the railroad company the quantity of land named for each mile of railroad completed and put in running order, and in each it is provided that the railway company shall receive the quantity of land granted per mile

when it shall have completed a section of its railroad of the stated length. "Upon what theory can side tracks be construed to be within the purview of the statute when they are not mentioned by the distinctive appellation by which they are commonly known? It is true that side-tracks are necessary appurtenances to every railway constructed for public use; but the deduction from this is not that the Legislature intended to grant lands for their construction, in the absence of words in the statute evidencing that intent." Railway v. State, before cited: A mile of railway means a mile in length of the road, composed of the main track, side tracks, turnouts, switches, etc. The grant being for a completed mile of railway and there being nothing in the special act. under examination to indicate to the contrary, it must be construed to mean a mile in its length, including side tracks. Railroads are permitted to charge three cents per mile for passenger fare, and a certain. rate per mile, or per hundred miles, for carrying freight, but it would not be contended that the side tracks might be added in either case.

The trial court made the following finding of fact: "That on November 5, 1873, Governor E. J. Davis appointed Engineer Gray to examine said road from McKinney to Red River, and the sidings in said road from Houston to Bryan. The report being made, the Governor indorsed upon the same that it did not show that the main track from McKinney to Red River was built according to law, and rejected the claim for land certificates as to the main tracks from McKinney to Red River, but allowed the same for sidings over the entire road, including the sidings on the line from McKinney to Red River." From this finding of fact, which is not challenged by the railroad company, it appears. that the Houston & Texas Central Railroad Company did not claim land for its sidings under its charter, under the law of 1854, nor under the special Act of 1866, contemporaneously with the building of its railroad. After the road was completed to Red River, more than seven years after the enactment of this law, the company made application, which was granted, for land for the sidings for the whole length of the line. Can it be believed that the railroad company, believing that it was entitled to land for sidings, would have procured certificates for hundreds of miles of main track, making no demand for certificates for sidings? It is manifest that during the time of the construction of its. road, the officers of the company and the officers of the State did not construe the law, especially the special act of 1866, as it is now interpreted by the majority of the court.

The strongest argument advanced in the able opinion of my associates. is based upon the supposed "continuity" of purpose on the part of the Legislature in granting lands to railroad companies and the intention to place all railroads upon equality. Because the general law virtually reenacted the law of 1854, it is properly held by this court that the contemporaneous construction was likewise adopted as to that act, and if the Legislature had used the same language in the special act, the argument of the continuity of purpose to give the same quantity of land

to this company as to others would be forcible. But it is equally true that when the Legislature has applied different words to the same subject matter, the change of language evidences a change of purpose and intent on the part of the Legislature. Suth. Stat. Const., secs. 255, 256; Black on Interp. of Law, 191. As the adoption of the law of 1854 showed a continuance of the same policy as to railroads generally, it is equally true that the different language used in the special Act of 1866 shows an intention not to grant the same quantity of land to the Houston & Texas Central Railroad Company. Except by change of words, how could a different intention be expressed?

I am of the opinion that the judgment of the Court of Civil Appeals should be reversed, and that the judgment of the District Court should be affirmed.