**EASTERN TEXAS ELECTRIC CO. v. WOODS.　(No. 631.)**

(Court of Civil Appeals of Texas. Beaumont. March 31, 1921. Rehearing Denied April 27, 1921.)

**1. Master and servant ⬦➾361—Power company held subject to Compensation Act.**

Electric company operating a street railway in a city and an interurban railway, and engaged in furnishing electric light to the public and electric power for commercial purposes, *held* subject to the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1, 5246—2), in so far as it applied to its employés engaged in operating the electric power department of its business.

**2. Statutes ⬦➾181(2) — Interpretation leading to consequences mischievous and absurd inadmissible if susceptible of another interpretation.**

An interpretation of a statute which must lead to consequences which are mischievous and absurd is inadmissible if the statute is susceptible of another interpretation.

**3. Master and servant ⬦➾348—Compensation Act liberally construed.**

The Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91) being a remedial statute, must be construed with the utmost liberality of which it is capable.

**4. Statutes ⬦➾183—Provision may be enlarged or restrained to bring act within intention of Legislature.**

In the construction of a statute, the application of words of a single provision may be enlarged or restrained to bring the operation of the act within the intention of the Legislature when violence will not be done by such interpretation to its language.

**5. Statutes ⬦➾181(1)—Intent of Legislature must be enforced when ascertained.**

The intent of the Legislature in enacting a law is the law itself, and must be enforced when ascertained, though not consistent with the strict language, which will not be followed when it leads away from the true intent.

**6. Statutes ⬦➾184—Evil to be remedied and object to be accomplished must be kept in mind.**

The evil to be remedied and the object to be accomplished by a statute must be kept constantly in mind in arriving at the legislative intent.

---

⬦➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. Master and servant ⟨⟩348—Statutes ⟨⟩ 225¼—Compensation and street railway acts passed at same session presumed actuated by same policy.**

The Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), and the act increasing the powers of street and interurban railway corporations, having been passed at the same session of the Legislature, the Thirty-Fifth, and within a few days of each other, it is to be presumed that they are imbued with the same spirit, and actuated by the same policy, and they should be construed each in the light of the other in determining employments within Compensation Act.

**8. Statutes ⟨⟩158—No repeal by implication except for inconsistency.**

Where there is no express repeal of one act by another, none is deemed intended unless there is such an inconsistency as precludes the presumption.

**9. Master and servant ⟨⟩348—Compensation Act not repealed by act enlarging powers of street railways.**

The Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91) in its application to an electric company operating a lighting and power department, as well as a street railway and an interurban railway, held not repealed by Act 35th Leg. (1917) c. 178 (article 1121, subd. 60), increasing the powers of street and interurban railway corporations.

**10. Corporations ⟨⟩372—Grants by Legislature construable in favor of the public.**

In the case of grants by the Legislature to corporations, public or private, only such powers and rights can be exercised by the companies under them as are clearly embraced within the words of the act or derived therefrom by necessary implication, regard being had to the object; any ambiguity in terms being resolved in favor of the public.

**11. Master and servant ⟨⟩278(11)—Evidence held to show electric company negligent.**

In an action for injuries from electric shock when repairing wires on a pole by the employé of an electric company, evidence held sufficient to sustain the jury's finding that defendant company was guilty of negligence in leaving severed wires on the pole in connection with main primary wires carrying high voltage, and that such negligence was the proximate cause of the injury.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by E. Woods against the Eastern Texas Electric Company. From judgment for plaintiff, defendant appeals. Affirmed.

Orgain & Carroll, of Beaumont, for appellant.

Collins, Morris & Barnes, of Beaumont, for appellee.

O'QUINN, J. This is a suit by appellee, E. Woods, against the appellant, Eastern Texas Electric Company, for personal injuries alleged to have been sustained by him on the 26th day of May, 1919, while in the employ of appellant at Beaumont, Tex., alleging that appellant owned and operated the electric light plant in the city of Beaumont, with many wires extending from its power house strung upon poles in every direction, and that to keep said wires and poles intact appellant had and kept in its employ many laborers (more than five-three), and that appellant had not taken out workmen's compensation or employers' liability insurance as required by law, although appellant was not exempted by law from so doing; that on said May 26th appellee was an employé of appellant engaged in working upon said electric lines; that on said date, while in the course of his said employment, it became necessary for him to ascend a light or wire pole for the purpose of arranging certain wire connections at the top of the pole; that near the top of said pole there were two wires that had been cut and pulled together in such manner as to impede his way; that the cutting of said wires had been negligently done by another employé of appellant, leaving the insulation ragged or torn at the ends; that the said wires were cut, misplaced, and left connected to the electric current, and their ends drawn together and dangerous, and rendering the place and condition not safe for appellee to work; that appellant's foreman, Potts, told appellee, before going to work at said place, that said cut wires were dead wires and not connected with the electric current; that appellee's right hand, in reaching for the breaker to turn said cut and twisted wires out of his way, came in contact with the ragged end of one of said wires, from which contact he was severely burned in his right hand, and so severely shocked that he became unconscious, and was also badly burned on both legs; that said current held him in a deathlike grip, and, when a companion worker succeeded in pulling him loose, he fell, and from the effect of said fall received a bad hernia and severe internal injuries on his left side; that all the flesh was burned from the palm of his right hand, and that in healing it is left scarred and stiff and of little use to him; that in addition to his burns (injured hands and legs), he has a serious hernia, which has caused him to wear a truss and hurts all the time; that at the time of his injury he was 58 years old, and had a life expectancy of 18 years, and was at the time earning $130 per month. Appellant answered by general and special demurrers, general denial, and plea of contributory negligence, assumed risk, and especially that it was and is a corporation incorporated under the laws of the state of Texas for the purpose of constructing, acquiring, and operating electric street railways and interurban rail-

ways for the transportation of freight and passengers, with power to acquire, own, and operate other public utilities in and adjacent to the towns and cities within or through which it should operate, and with power to acquire, own, hold, and operate electric light plants in and adjacent to the cities or towns through or within which it should operate, all of which said powers it was exercising on or before the time of appellee's injury; that by reason of the purpose for which appellant was incorporated and engaged it was precluded and is precluded by article 5246—2 of Vernon's Texas Annotated Civil Statutes Supplement from giving itself the benefit of such insurance.

Appellee, in. supplemental petition, answered, contending that appellant's answer of assumed risk, contributory negligence and fellow-servant doctrine could not avail, for the reason that appellant was a corporation employing more than three (five) employés, and had not taken out compensation insurance on its employés, or become a subscriber under the Workmen's Compensation Act (Acts 1917, c. 103 [Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91]), and that appellant did not come within any of the exceptions under said act, and under the law was denied the defenses of assumed risk, contributory negligence, and fellow-servant doctrine, and denied generally appellant's allegations.

To this appellant replied by supplemental answer, by general denial, and specially answered that, if appellant was required under the laws of the state of Texas to take out workmen's compensation insurance, the dangers which resulted in appellee's injuries were: (1) Such as were inherent in the business of the work in which appellee was engaged, and assumed by him; (2) that the injury was occasioned by the negligence of appellee, without negligence on the part of appellant, and that said negligence was the proximate cause of said injuries.

Appellee replied by second supplemental petition, by general demurrer, and again pleaded that appellant was a corporation employing more than three (five) employés, and had failed to take out compensation insurance on its employés under the Workmen's Compensation Act, or to become a subscriber under any of the exceptions to said act, but was subject thereto, and by reason of said failure was denied the defenses of assumed risk and contributory negligence, and denied all the allegations in said answer.

The court refused to sustain appellee's exception and plea that appellant was subject to the Workmen's Compensation Act, and therefore was denied the defense of assumed risk and contributory negligence, and the case went to the jury on special issues, upon the answers of the jury to which the court rendered judgment for appellee in the sum of $3,300. Motion for new trial was overruled, and appellant appeals.

The evidence disclosed that appellant is a private corporation incorporated under the laws of the state of Texas; that it was originally chartered as Jefferson County Traction Company for the purpose of constructing, acquiring, maintaining, and operating lines of electric, gas or gasoline, denatured alcohol, or naphtha motor railways within and between the city of Beaumont, in Jefferson county, Tex., and the city of Port Arthur, in Jefferson county, Tex., for the transportation of passengers and freight, and to construct, own, and operate union depots, with the right or authority to produce, supply, and sell electric light and power to the public and to municipalities. By successive amendments to its charter its capital stock was materially increased, and its name changed to Eastern Texas Electric Company, and its purpose enlarged as permitted under subdivision 60, art. 1121, Vernon's Sayles' Civil Statutes, and declared to be:

"For the purpose of constructing, acquiring, maintaining, and operating lines of electric, gas or gasoline, denatured alcohol, or naphtha motor railways within and between the city of Beaumont, in Jefferson county, Texas, and the city of Port Arthur, in Jefferson county, Texas, for the transportation of freight and passengers, or both, with power also to construct, own and operate union depots and office buildings, and this company shall have the right and authority to acquire, hold, and operate other public utilities in and adjacent to the cities or towns within or through which it operates or shall operate, and this corporation shall be and is authorized to own, acquire, hold and operate electric light and power plants in and adjacent to the cities or towns within or through which it operates or shall operate. * * * This corporation shall be and is also authorized, under and pursuant to chapter 178 of the General Laws passed by the Thirty-Fifth Legislature at its regular session, chapter 79 of the General Laws passed by the Thirty-Fourth Legislature at its regular session, and chapter 14 of the General Laws of the Thirty-Fourth Legislature passed at its first called session, and all other authority, thereto enabling it to acquire, hold, maintain, and operate the Jefferson county properties, plants, rights, franchises, and businesses of the Beaumont Electric Light & Power Company, Beaumont Traction Company, and Port Arthur Light & Power Company, all Texas corporations."

The evidence further disclosed that at the time of the injury to appellee appellant was the owner of and was operating the properties of the Beaumont Traction Company (Beaumont street railway), Beaumont Light & Power Company, and Port Arthur Light & Power Company. Thus it will be seen that appellant was engaged in three distinct undertakings, viz. operating an interurban line of railway between the cities of Beaumont and Port Arthur, operating the street rail-

way system in the city of Beaumont, and operating the electric light plants that supplied the cities of Beaumont and Port Arthur with electric lights and supplied electricity to the public for commercial purposes.

It further appeared from the evidence that on Saturday before the appellee was injured on Monday there was a storm that blew down many of the poles on which the wires for lighting and power were strung, in various parts of the city, and that appellant's employés were engaged in repairing the damage; that on Sunday live wires on poles down on Crockett street were cut to get them out of the way of people and to avert injury; that Monday appellee and several other employés were sent by appellant's foreman, Mr. Potts, out on Crockett and Victoria streets to repair the damage done by the storm; that while appellee was up one of the poles on Crockett street for the purpose of repairing and reconnecting some power wires that had supplied power to several commercial concerns, in reaching for the breaker to turn the ends of the cut wires out of his way, his right hand came in contact with the end of one of the cut wires, and he was severely burned in his hand and about his legs, and rendered unconscious, and held in the grip of a 2,300-volt electric current until one of the other employés climbed the pole and fastened his safety belt about appellee and to the pole, and then pulled appellee loose from the grip of the electric current, when appellee fell some eight feet, and was held suspended by the safety belt, and then taken down unconscious; that by reason of the shock and violence of the fall appellee, in addition to his severe burns, suffered a hernia in his side, from which he suffers great pain and has to wear a truss; that practically all the flesh was burned from the palm of his hand; that it was burned almost through, leaving the bones and ligaments open to view, and that in healing it is left scarred, drawn, and stiff and practically useless; that appellee will not be able to resume his avocation in the future.

Appellant assigns a number of errors, but, as we view the record and construe the law, there are but two questions necessary for us to determine, viz.: (1) Was appellant as to the operation of its lighting system that supplied electricity for lighting and commercial purposes, and its employés engaged in operating same, subject to the Workmen's Compensation Act? and (2) did appellee prove negligence on the part of appellant? If these two questions are to be answered in the affirmative, then this case should be affirmed; otherwise it should be reversed.

[1] As we view the record and construe the law, appellant was subject to the Workmen's Compensation Act in so far as it applies to its employés engaged in operating the electric lighting system for the purpose of furnishing electric lights to the public and electric power for commercial purposes. It unquestionably appears from the evidence that appellant was originally incorporated on August 2, 1912, for the purpose of operating an electric interurban railway between the cities of Beaumont and Port Arthur, as its only business, and that it was so engaged up to and until July 19, 1918, when it amended its charter enabling it to "acquire, hold, maintain, and operate the physical properties, plants, rights, franchises, and businesses of the Beaumont Electric Light & Power Company, the Beaumont Traction Company, and Port Arthur Light & Power Company," and that afterwards it did acquire said properties, and at the time of the injury to appellee was engaged in operating same, all under the charter and name of Eastern Texas Electric Company, as side lines of business, but not necessary to its main business.

The first two articles of said Workmen's Compensation Act are:

"Art. 5246—1. In an action to recover damages for personal injuries sustained by an employé in the course of his employment, or for death resulting from personal injuries so sustained, it shall not be a defense:

"1. That the employé was guilty of contributory negligence.

"2. That the injury was caused by the negligence of a fellow employé.

"3. That the employé had assumed the risk of the injury incident to his employment; but such employer may defend in such action on the ground that the injury was caused by the willful intention of the employé to bring about the injury, or was so caused while the employé was in a state of intoxication.

"4. Provided, however, that in all such actions against an employer who is not a subscriber, as defined hereafter in this act, it shall be necessary to a recovery for the plaintiff to prove negligence of such employer or some agent or servant of such employer acting within the general scope of his employment."

"Art. 5246—2. The provisions of this act shall not apply to actions to recover damages for the personal injuries * * * sustained by domestic servants, farm laborers, nor to employés of any firm, person or corporation having in his or their employ less than three (3) employés, nor to the employés of any person, firm or corporation operating any steam, electric, street, or interurban railway as a common carrier: Provided, that any employer of three or more employés at the time of becoming a subscriber shall remain a subscriber subject to all the rights, liabilities, duties, and exemptions of such, notwithstanding after having become a subscriber the number of employés may at times be less than three."

Appellant contends that the expression "nor to employés of any person, firm or corporation operating any steam, electric, street or interurban railway as a common carrier" exempts it wholly from the provisions of said act as to all of its employés, regardless as to the labor they perform, whether on the

street railway, the interurban railway or light plants, or on the lines operated for furnishing electric lights to citizens in their homes, or power to business concerns for commercial purposes; in other words, as the statute excepts from its provisions the employés of "any person, firm or corporation operating any steam, electric, street or interurban railway as a common carrier," and it being chartered for the purpose of operating and engaged in operating both street and interurban railways, that that excludes it and all of its employés from the operations of the law, although it is also engaged in operating the electric light plants and furnishing lights and power to the public, a business that is within the operation of the law, and that by reason of it being excepted for the one purpose it is excepted for all purposes. It is unquestioned that, appellant being a corporation engaged in operating an electric street and interurban railway, it and its employés engaged in that business are exempt from the provisions of the Workmen's Compensation Act; but does it follow that other employés working for appellant at other labor and in carrying on another business not necessarily connected with or in furtherance of its said railway business are also without the law, simply because they are in the employ of a "corporation engaged in operating a street or interurban railway"?

We cannot agree to this contention. We believe that appellant is subject to the law, in so far as its employés engaged in operating the electric lighting system for the purpose of furnishing lights and power to the public for home lighting and commercial purposes are concerned. If appellant were engaged in running the electric light plant for the purpose of supplying lights and power for commercial purposes alone, there could be no contention but that it would come within the law. If it should then enlarge its business by buying the street car system and the interurban line, which are not within the law, would that take out of the law the other business in which it was engaged? We do not think so, but it would still be amenable and subject to the law as to its lighting business, the same as if its business had not been enlarged, although its new business enterprises would not. We believe that the law, under the circumstances, exempted only the interurban and street railway business, and the employés engaged directly in their operation, or necessarily incident thereto and in furtherance thereof, and leaves its employés engaged in the operation of the lighting business, supplying lights for homes and power for commercial purposes, under and within the operation of the law. To hold otherwise, we believe, would be to read into the law an exception or exemption not intended by those who made the statute.

By reference to the law under which appellant is incorporated, it will be seen that appellant is permitted to engage in several different kinds of business. If, by permitting a corporation to engage in two or more activities, one of which is embraced within the Workmen's Compensation Act, and the other not, and letting the one not embraced control the whole, and thereby exclude the one within the law, would be to read exceptions into the law never contemplated nor intended by the Legislature, and to deny the employés engaged in the work on that part of the operations embraced within the law their protection under the law.

The charter of appellant contains this language:

"And this company shall have the right and authority to acquire, own, and operate other public utilities in and adjacent to the cities or towns within or through which this company operates or shall operate."

The Workmen's Compensation Act, art. 5246—2, contains this expression:

"The provisions of this act shall not apply to actions to recover damages for personal injuries, nor for death resulting from personal injuries, sustained by domestic servants * * * nor to the employés of any person, firm or corporation operating any steam, electric, street or interurban railway as a common carrier."

[2] Not construing the rights of appellant in acquiring other public utilities, nor what other public utilities it might acquire, but to illustrate the mischief that would follow a literal interpretation of the above, let us suppose that appellant would buy up the ice plant, gas plant, sewer system, waterworks, and telephone system in the city of Beaumont and the same in the city of Port Arthur, they being "other public utilities," and proceed to operate them as it is doing the electric light plants that it acquired at Beaumont and Port Arthur. Under a literal interpretation of the above laws, each of the utilities thus acquired would be exempt from the provisions of the Workmen's Compensation Act, although they were each subject to it before being acquired by appellant. Such construction would give appellant exemptions not expressed in the law, and thus deprive the employés of all such utilities of all the benefits of said act, a thing never contemplated by the Legislature. The rule is well established that an interpretation of a statute which must lead to consequences which are mischievous and absurd is inadmissible if the statute is susceptible of another interpretation by which such consequences can be avoided.

[3-6] The Workmen's Compensation Act is remedial, intended primarily for the protection of employés and to guaranty compensation in case of injury or death, regardless of the liability on the part of the employer under the common law or other statutory

liability. It seeks to take from employés the rigors of the common-law defenses of assumed risk, contributory negligence, and the fellow-servant doctrines for redress of injuries. Being remedial, it is to be construed with the utmost liberality of which it is capable. In the construction of a statute, the application of words of a single provision may be enlarged or restrained to bring the operation of the act within the intention of the Legislature when violence will not be done by such interpretation to the language of the statute. Intent of a statute is the vital part, the essence, of the law. The intention of the Legislature in enacting a law is the law itself, and must be enforced when ascertained, although it may not be consistent with the strict language of the statute. Courts will not follow the letter of a statute when it leads away from the true intent and purposes of the Legislature and to conclusions inconsistent with the general purpose of the act. Edwards v. Morton, 92 Tex. 152, 46 S. W. 792; B. v. M., 63 Tex. 298; Russell v. Farquhar, 55 Tex. 355; Lewis' Sutherland Statutory Constructions, vol. 2, §§ 348, 376. A thing which is within the subject, spirit, and meaning of the statute is as much within the statute as if it were within the letter. Conversely a thing which is not within the intent and spirit of the statute is not within the statute, though within the letter. Lewis' Sutherland Statutory Construction, vol. 2, § 379, p. 730. The evil to be remedied and the object to be accomplished must be kept constantly in mind in arriving at the intent of the Legislature in enacting the law.

[7-9] The Workmen's Compensation Act, under discussion, was passed by the Thirty-Fifth Legislature at its general session, and was approved by the Governor on March 28, 1917, and became a law at once. The law having for its purpose the increasing of the powers of street and interurban railway corporations, under which appellant was incorporated, was also passed by the Thirty-Fifth Legislature, and was approved by the Governor on April 2, 1917, and became a law 90 days after adjournment (Laws 1917, c. 178 [Vernon's Ann. Civ. St. Supp. 1918, art. 1121–60]). We think they should be construed together, and given that interpretation that will effectuate the intent of each of them, if not inconsistent. Having been passed at the same session of the Legislature, and within a few days of each other, it is to be presumed that they are imbued with the same spirit and actuated by the same policy, and should be construed each in the light of the other. Railway v. State, 95 Tex. 507, 523, 68 S. W. 777. It is but reasonable to conclude that the Legislature, when it passed the last act (the one under which appellant is incorporated), had in mind its very recent and previous legislation (Workmen's Compensation Act), and did not intend to repeal or modify any part of same. Where there is no express repeal, none is deemed to be intended, unless there is such an inconsistency as precludes this presumption. We do not believe there is any such inconsistency here, but that the Legislature, in enacting the amended corporation law, simply intended to enlarge the purposes for which such corporations might be chartered, and not to restrict or in any manner take from the Workmen's Compensation Act, but to leave it unimpaired and the different businesses in which corporations were, by the latter act, permitted to engage, and their employés engaged in operating same, to remain unchanged.

[10] The settled rule of construction in grants by the Legislature to corporations, whether public or private, is that only such powers and rights can be exercised under them as are clearly embraced within the words of the act, or derived therefrom by necessary implication; regard being had to the object of the grant. Any ambiguity or doubt arising out of terms used by the Legislature must be resolved in| favor of the public. Would not the rule be reversed if the statute should receive the construction contended for by appellant? Would it not be reading into the act words and exemptions never intended by the Legislature? But we do not believe there is any conflict in the two statutes, but that each can be given the full interpretation and intent of the Legislature, and do no violence to either. A fair interpretation, we think, of section 2 of the Workmen's Compensation Act, would be that the provisions of said act did not apply to actions to recover damages by employés of any person, firm, or corporation who were at the time of the injury engaged in the operation of the business exempt from the provisions of the law (in this case appellant's transportation system), but that said law does apply to employés who, while working for such employer, were engaged at and with work of a different nature, and not necessarily in connection with nor in the furtherance of the exempted business. Cattle Co. v. Pastrana, 217 S. W. 749. In the case cited the cattle company was incorporated for ranch purposes—cattle raising—and also carried on farming. In a suit by an employé who was at the time of his injury engaged in labor in connection with the ranch business the company pleaded that he was a farm hand, and that the statute exempted farm hands from its provisions, and that they were engaged in farming, and so were not included within the scope of the law. The court refused to sustain the contention and held that at the time the employé sustained his injury he was engaged in work in connection with and in furtherance of the ranch business, and therefore entitled to the benefit of the Compensation Act. We think that case is very much in point in this case. There the company was engaged in two dif-

ferent businesses, one within the law, and the other not so. Here the company is engaged in two different businesses, one within the law, as we construe it, and the other not so. As the Supreme Court has denied a writ of error in the above-cited case, we believe that the principles announced therein are decisive of the question in the instant case.

There is no testimony in the record that appellee ever did any work on the interurban or street railway lines that is directly connected wtih the operation of them, but the testimony, we' think, negatives that fact.

Appellee testified:

"I went to work for the Eastern Texas Electric Company (the last time) on the 13th day of January last year. The first month I worked in the meter department. I quit the meter department and went to work for Mr. Boggess on the next day and worked for him until I was hurt. During the time that I was working for the Eastern Texas Electric Company they had employed about 15 or 20 men to my knowing in the meter department and on the wagon. In this particular department—keeping up the lines, linemen, and pole men—well there was about 10 or 12 linemen and ground men. In the meter department there is quite a few of them."

The testimony is undisputed that at the time he was injured he was working on lines entirely separate and apart from the street railway lines and the interurban lines, not connected with them. The testimony shows that there were no tracks or lines of either street railway or interurban railway at the place where he was injured. Appellee further testified:

"The nearest line of street car' line of the Eastern Texas Electric Company, I guess Calder (avenue) would be about as close. ' It would be about half a mile or something like that. Those wires that were near that point extended or carried the current to the Beaumont Iron Works. The Beaumont Iron Works uses that current off- of that line out there I know, and several other plants up and down Crockett street, but I don't know all the places. The Eastern Texas Electric Company or its transportation system has no car lines running out on Crockett street. It crosses Crockett street. They cross Crockett street on Pearl."

The witness Horn testified:

"I know where the Beaumont Traction Company's line or Eastern Texas Electric Company's lines run, their railroad line. That pole I was at work on (where appellee was injured) was about three blocks from any of the railroad lines of the Eastern Texas Electric Company. That line I was working on was not connected with the service department of the traction company's line."

The witness Potts (foreman for appellant) testified:

"These lines on Crockett street do not connect with the transportation department of the Eastern Texas Electric Company. Each branch of the Eastern Texas Electric Company takes care of itself. The Eastern Texas Electric Company bought the Beaumont lighting system before they bought the traction company. They belonged to a separate and distinct company before they were consolidated. These wires belonged to a separate and distinct company until the Eastern Texas Electric Company bought them. I am foreman of men who worked on both lines, the whole system. I had 12 or 14 men under me at that time."

The undisputed testimony shows that at the time appellee was injured he was working on the lines of appellant that supplied light and power for home lighting and commercial consumption, and that said lines were not connected with the transportation department of appellant.

It follows from what we have said that the court should have sustained appellee's exceptions to appellant's answer of exemptions from the Workmen's Compensation Act and its plea of assumed risk, contributory negligence, and the doctrine of fellow servant. The exception was well taken, and should have been sustained, and appellant denied the defenses named.

This brings us to a discussion of the second question above suggested, viz.: Was negligence on the part of appellant shown?

By its first assignment of error appellant complains of the refusal of the court to give its special requested charge for a peremptory instruction in its favor; this on the ground that no negligence on the part of appellant was shown by the facts.

Appellee, Woods, testified with a miniature pole with cross-arms and wires attached, representing the pole in question, before him:

"My trade is lineman—electricity. I have been following that trade continuously for about 18 years. The last work I did as a lineman was on the 26th day of May last year. I have worked for the Eastern Electric Company. The last time I went to work for them on the 13th day of January last year. The first month I worked in the meter department. I quit the meter department and went to work for Mr. Boggess on the next day and worked for him until I was hurt. I worked as lineman for Mr. Potts (foreman of appellant) from about the middle of February until the 26th day of May, 1919. I was injured on that day, the 26th day of May, 1919. Before I got hurt, Mr. Boggess, Horn, and Moore and myself did some work on Calder. When I went to do this last work when I got hurt, Moore, Boggess, and Horn were with me when I left the storeroom. I received instructions at the storeroom as to what work I was to do. Mr. Potts gave them to me. He told us to get three strands of No. 6 wire and go down and put it on the space that had been cut out on Saturday before. He said: 'Cut it in on the south pole where it was cut first. Bring it then to this job .and take them dead ends off of there and dead-end them back in the breakers, and cut them in on the primaries.' He said: 'Bring it back here and dead-end it into

this. Take the old out that was in there; that it was dead back here.' That's what I understood. I climbed up the pole and stopped below this wire along here. It is a cable messenger wire. I looked through here and still I couldn't see where they were cut. The washer was against the bolt that comes through the messenger. Well, of course, the cable was hanging on the messenger, and that grounded the whole business. I reached my right hand to catch the breaker, and as I reached to catch the breaker this point hit me here in my right hand. When I reached with this other hand to catch the breaker it brought my knee too close to the arch point. I was trying to catch this breaker and the wire was bent in that way and the point hit me in the palm of my hand. The wire that burnt my hand was No. 6. If I had got the breaker I could have switched it around, and I could have gone through right along. In all, taking the length of the breaker and the length of the wire together, it hung down about 14 inches. I didn't know anything after I got that burn until I was on the ground. I didn't know anything after I reached for that breaker. Anything that happened after that I don't know about it. My hand was burnt all out in the center there. I can use this finger, but this one is no good, and this one you can see I can't get back. It was burned in two, and that won't let it come back. I received a burn on this knee and this leg. I can't see that the condition of my hand has improved. I won't be able to resume my trade on account of my hand. Besides those burns, my side was injured. I am ruptured now. I have worn a truss ever since. I was not that way before. I can't bend down to pick up anything. I feel the pain in my side all the time. At this particular time when I was injured I was the first one to start up the pole. I had done put the wire on the pole south of this one. I couldn't see where the jumper wire was severed from the primary wire before I climbed the pole. I come back to the pole where I got hurt and got under the pole, and I stopped and looked up through there and couldn't tell whether they were cut loose. I could see the two jumper wires, could see the three primary wires; I could see that the three jumpers projected towards the three primary wires. Those wires that I couldn't see whether they were cut loose or not were carrying 300 volts of electricity. These two wires that are on the fifth cross-arm—this is a primary and this is a primary; this is what I call a two-phase primary—they carry 2,300 volts of current. I thought I knew the condition of the wires when I climbed up there. I was informed that they were dead. I thought they were dead. There is a regulation way in cutting wires when it is necessary to detach them from the primaries. The regulation way is if they are in your way you cut them off at the primaries and then cut them out because they cannot be used any longer. The nearest line of street car line of the Eastern Texas Electric Company I guess Calder would be about the closest, about a half a mile, something like that. Those wires that were near that point extended or carried current to the Beaumont Iron Works, and several other plants up and down Crockett street uses current off that line. The Texas people have a plant down there. There are no car lines running out on Crockett street. It crosses Crockett at Pearl. During the time I was working for the Eastern Texas Electric Company they had employed about 15 or 20 men in the meter department and on the wagon. In this particular department, keeping up the lines, linemen, and pole men, well, there is around about 10 or 12 linemen and ground men. In the meter department there are quite a few of them. I said Mr. Potts said the jumper wires were dead; said they were cut out."

The witness Willbanks testified:

"I have worked for the Eastern Texas Electric Company. I know Mr. Woods. I remember the occasion when Mr. Woods got burned on a wire. I was working for the Eastern Texas Electric Company at that time. I was in the construction department as a lineman. I have been working as a lineman for about 13 years. I am the man that cut this wire loose on the pole down on Crockett street that was blown down by the storm—the day the storm blew it down. Jones and Green and Moore were with me when I cut it. They work for the Eastern Texas Electric Company as linemen. Mr. Jones was in charge that day. I cut them loose in order to clear them up off the ground. There was a whole lot of plants feeding off this wire. These wires were dead at the time I cut them. I knew that before I cut them. They had been killed at the plant. That was not the regulation way of cutting those wires. The regulation way is to cut them off here. We cut them off that way at the time because we were in a hurry to clear up that wire in order to make it hot again. I cut the wires under Mr. Jones' direction. The power had been cut off so as to keep the people who were passing along that street from getting into the live wires. On Saturday before Monday, the day Mr. Woods received his injury, there was a storm, which put a great number of the lines in the streets. From Saturday up until Monday all the linemen and helpers were working trying to clear up the situation. The weight of the circuit breaker would cause the jumper wire on the cross-arm to drop a little if it was cut These primary wires carried 2,300 volts electric current."

The witness Boggess testified:

"I have worked for the Eastern Texas Electric Company. The last time I commenced on March 2, 1919, and continued through until about the last of August. I know Mr. Woods. I have worked with Mr. Woods for the Eastern Texas Electric Company, and I remember the occasion when he got burned on a live wire. I was present. The first notice I had of it was when I heard him grunt a little. I looked up and knew as soon as I looked up what was the matter. I went up the pole as fast as I could. His hand was in this position with his knee out like that, and the point of the wire sticking in the palm of his hand like that. I fastened myself with a safety belt around the pole and then took his belt and fastened around my shoulders and put it around him and pulled him back and when he fell he fell right down in my face. He was absolutely unconscious. One of the contacts was on the point of his knee right

against the ground here, and, as I told you before, I pulled him away, broke the circuit, and the weight of his body pulled him down. The electricity had him drawn up in such position he couldn't get loose. He fell about eight feet from the position when I jerked him loose from the contact. Yes, sir; about eight feet. His body was suspended by my safety. I went to the hospital with him. I saw his hand. I saw his leg when the doctor was dressing it. All the flesh was burnt out of his hand. You could see the bones right across there. When we started to the hospital he was not in his right mind. He had revived some. You could see some signs of life. I looked at the condition of the wire before we started to work. That is something you can't tell, the condition of the wire from the ground. I have been a lineman 10 years. To keep those wires from hurting you when they are not in their right condition, they are heavily insulated with rubber. When this wire caught Mr. Woods' hand, it wasn't insulated. It had been cut was what caused it not to be insulated, leaving the end exposed. The pole you show me is a fairly good representation of that pole. This one and this one and this one right here were the jumper wires attached to each primary. This is a primary and this is a primary and this is a primary, and they were attached to the primaries, one jumper attached to each primary. Those jumper wires were cut because they were blowed down in the street. The thing that I call the point touching his knee was called an arch support, arch light support. The fact is this is the ground, this the primary, and he completed the circuit by touching here, and this wire there, and that's what gave him the circuit. This was a 2,300-volt wire. Here's where they cut those high voltage wires; cut it off there and then we cut it off from over here. With reference to the primaries and for the purpose of the record, why you cut them there. You are supposed to cut the wire loose here. If it had been cut next to the primary wire, it would not have been a live wire when Mr. Woods touched it. These wires were cut when there was no current in them. The two jumper wires on the east side of the pole, the one on which Mr. Woods got into, were connected to the two primary wires. If those two jumper wires are attached to the primaries carrying 2,300 volts, after the jumper wires have been clipped, a connection could not be made back to the jumper wires at this point, which is near the cross-arm supporting the jumper wires. You have got to take this out; take all of this out back to here; take the jumper wire out back to the primary; take it out to the insulators on the cross-arm. Whether it can be done at any point going back to the primary wires—make a connection to the jumper wires on the cross-arm or next the cross-arm—well, they don't do it. I don't know if it can be done. I have been an electrician 10 years, and during that time I have worked on lines carrying 2,300 volts, and we put in new wires all the time from over here to there, because it was dead. The cross-arms on this particular pole, running north and south, supports primary wires. The fifth arm supports the primaries. The fourth arm supports three primaries. The second arm supports secondaries. Secondaries are not jumper wires. That is for the lights that goes in your house. The first and third cross-arms, running east and west, support jumper wires. When these wires were cut down they were dead. I was working for the electric company at the time. I know of my own knowledge they were dead. In the morning before this injury occurred we had a windstorm, which caused these wires to fall. The foreman told me they were dead at the time. The foreman of the shop gave us instructions for so many men to go around and clear up these conditions. My experience as an electrician has taught me there is a regulation way to sever wires from primaries. The regulation way requires that it be cut absolutely clear of the main line at all times. The regulation way and the customary way to detach jumper breaker wires I say is to take out or cut out the jumper wires."

The witness Horn testified:

"I am a machinist by trade. I have worked for the Eastern Texas Electric Company. I have never been a lineman. When I was working for the Eastern Texas Electric Company I was a lineman's helper. At the time Mr. Woods went up the pole, I was standing on the ground by the pole. When Mr. Woods fell, he knocked Mr. Boggess loose from the pole. I climbed up the pole and helped Mr. Boggess to get him back and helped to hang Mr. Woods on the step. There was some negroes close by, and I asked them to help get him down. His right hand was burned almost through. I could see the bones in it. There was nothing left but the skin and bones. I didn't examine his legs. Just as I got back Mr. Boggess had got him on the ground and was looking to see if he could get him to breathe. I saw Mr. Woods there when he got hurt. I was looking up. He reached towards the breaker, that thing right there. That's the breaker. I didn't see him do anything after that wire struck him in the hand. He couldn't do anything. The primary wires carried 2,300 volts of electricity. I had orders to connect all three of those primaries on that pole. Mr. Potts gave me these instructions. I was sent from the power house that morning with Mr. Woods when he went down there. Before we started I heard Mr. Potts tell Mr. Woods something about the wires. Mr. Potts was foreman of the company. I know where the Eastern Texas Electric Company's lines run, their railroad line. That pole we were at work on was about three blocks from any of the railroad lines of the Eastern Texas Railway Company. That line he was working on was connected with the service department of the traction company's line. Mr. Potts said those wires were dead. These here jumper wires was dead. We had been working since Saturday putting up poles and wires. Mr. Potts was foreman; he had charge of all the men."

Mr. Potts, witness for appellant, testified:

"I have been employed by the Eastern Texas Electric Company since it was organized. I was in the employ of some of the old branches of the concerns that operated the lines prior to the time the Eastern Texas Electric Company took charge of it. I worked for the Beau-

mont Traction Company and Jefferson County Traction railroad. I have been employed by them a little over 10 years. We had a storm on Saturday before Monday, the day Mr. Woods received his injury. That storm tore down a lot of those wires. That was the effect on the lines all over the city of Beaumont. We worked until about midnight Saturday night, two men all night, worked right on until about 11 o'clock Sunday night, and on Monday we were all trying to make repairs. Some of the lines took a week before we got them back in service. I recall the incident of Mr. Woods having received his injury on Monday. He did some work before he went out to do this particular piece of work. The kind of work Woods did, they went and reset a pole back of the Millard school. Mr. Woods had not been on the job a few days prior to that. He had been sick. He had worked for me two or three times, but he had been on this time about six months. He was a lineman, and his duty called him to work upon lines carrying 2,300 volts of current. I instructed them to go out to Crockett and Victoria streets. I told them to go out and put up those certain lines. I told him the line to work on. I told him to work on the Texas Supply Company's line. I knew there was work to be done on this particular pole where Woods received his injury. These lines on Crockett street do not connect with the transportation department of the Eastern Texas Electric Company. Each branch of the Eastern Texas Electric Company takes care of itself. The meter departments puts up meters and tests them. The lighting department is the whole power plant. Before the Eastern Texas Electric Company bought the Beaumont Light & Power Company these wires belonged to a separate and distinct company. The Eastern Texas Electric Company bought the Beaumont lighting system before it bought the traction company. They belonged to a separate and distinct company before they were consolidated. These wires belonged to a separate and distinct company until the Eastern Texas Electric Company bought them out. Eastern Texas Electric Company has two plants for generation of power. These plants are located in Beaumont and Port Arthur. The power plant in Beaumont supplies power for lights and transportation and for commercial purposes. Both plants, the one at Beaumont and the one at Port Arthur, furnishes the power that supplies the street car system. Both plants furnish the power that supplies the lighting system, that generates the power that is sold to the people in Beaumont for the purpose of heating and lighting. The plant at Port Arthur generates current for the purpose of operating and propelling the interurban cars and generates the power that is sold to the people in Port Arthur for the purpose of lighting their homes. As to what particular power or line or whatever it is that is supplied by these primary wires on the cross-arm on this pole (where appellee was injured), well, I don't think there is any line at all. They are all power lines, these three are. I think the Texas Supply Company plant is supplied with power from these lines. It is a pipe concern to the left of Crockett street. This line supplies the Beaumont Iron Works. These supply the pipe machines. After these primary wires reach the transformer they do not furnish lights in different places, not these. I don't think any of the primaries are. That is what we call the power circuit. After they reach the transformer they do not supply the current which lights houses. They are power lines. These secondary wires on this same pole, they supply the lights. As foreman, I have charge of all the workmen under me. I had 12 or 14 men at that time."

The witness Jones testified for appellant:

"I am working for the Eastern Texas Electric Company. I work on its lines that gets power and current. A storm blowed some of the wires down Saturday before Monday when Mr. Woods was injured. I worked Saturday night, Sunday, and on Sunday night. I worked Monday. I don't know how long it was before we got the whole system back in shape after the storm; a week or so. Mr. Willbanks cut the wires on that pole. We cut them so we could put the other wires on the line at work. They were in the street. There were several places over town that lines were down in the street that carried 2,300 volts. I also cut those lines. Mr. Willbanks and Mr. Green were with me. The three wires in the street were primary wires running east and west on Crockett street. I would say that the wires were cut four to six inches of the circuit breakers. We were in a hurry cutting these wires to get them cleared up. I told Mr. Potts the wires were in the clear. I have been an electrician off and on for about 17 years. There is a regulation way to cut these breakers from the primaries if you are taking them down permanently."

Moore, witness for defendant, testified:

"I have worked for the Eastern Texas Electric Company about four years as a lineman. On Saturday before Monday, the day Mr. Woods received his injury, there was a storm. That storm tore a lot of lines down. It took all of the linemen and helpers for three or four days to get the lines back in order. I was not with the party on Saturday who cut the wires on the pole where Mr. Woods was injured. I was present Monday morning when Mr. Potts sent Woods and Boggess and Horn to do the work. These three wires right here on the same cross-arm, they were cut loose from the primaries and hanging down from the end of the circuit breakers about six inches. If it had been less dangerous to cut these dangling ends off and leave the end of the circuit breaker sticking out there, well, I don't know about that. It was according to the man; one man cuts them off there short and one might cut it another way. If they had been cut out of the circuit breakers, there would not have been any current to hurt a man trying to get hold of that circuit breaker. Well, if that jumper wire comes over there, there would be some then. If you take the whole thing out, there wouldn't be any danger."

The testimony is quite voluminous, covering 96 typewritten pages. A more extended statement of the facts is not deemed necessary.

The court submitted the following special issues to the jury:

(1) "Was the defendant negligent in leaving the severed wires on said pole connected with the main primary wires carrying the high voltage?" To which the jury answered "Yes."

(2) "If you shall have answered question No. 1 in the affirmative, you will find the following issue: Was such negligence the proximate cause of plaintiff's injury?" To which the jury answered "Yes."

[11] The question of negligence on the part of appellant was one for the jury, and the jury, in answer to the first and second special issues, found that the appellant was guilty of negligence in leaving the severed wires on the pole connected with the main primary wires carrying high voltage, and that such negligence was the proximate cause of appellee's injury. We think the evidence amply sustains the jury's finding. This renders the assignment not well taken, and it is therefore overruled.

If our holding that this case should have been tried under the Workmen's Compensation Act is correct, and the jury having found from the evidence that appellant was guilty of negligence, and that said negligence was the proximate cause of appellee's injury, then none of the matters presented by appellant's other assignments would have been a defense, are immaterial, and therefore overruled.

Appellant makes no question as to the extent or seriousness of appellee's injury, nor that the amount of the judgment is excessive.

The appellant not being a subscriber under the Workmen's Compensation Act, and the evidence amply sustaining the finding of the jury that appellant was negligent in leaving the severed wires on the pole in question connected with the main wires carrying high voltage, and that said negligence of appellant was the proximate cause of appellee's injuries, the court did not err in rendering judgment for appellee, and said judgment is affirmed.